David I. WELLS, Plaintiff,

v.

Nelson A. ROCKEFELLER, as Governor of the State of New York, Louis J. Lefkowitz, as Attorney General of the State of New York, John P. Lomenzo, as Secretary of State of the State of New York, Malcolm Wilson, as Lieutenant Governor of the State of New York, and Presiding Officer of the Senate of the State of New York, and Perry B. Duryea, Jr., as Speaker and Presiding Officer of the Assembly of the State of New York, Defendants,

and

Earl W. Brydges, as Temporary President of the New York State Senate, Intervenor.

No. 66–Civ.–1976.

United States District Court, S. D. New York.

March 23, 1970.

Judgment Affirmed May 18, 1970. See 90 S.Ct. 1696.

Robert B. McKay, New York City, for plaintiff.

George D. Zuckerman, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of New York, New York City, of counsel), for defendants.

Doanld Zimmerman, New York City, for intervenor.

Before MOORE, Circuit Judge, Mac-MAHON and CANNELLA, District Judges.

MOORE, Circuit Judge.

As a result of the retention of jurisdiction, this court has the dubious privilege of deciding for the third time whether the New York State Legislature has divided its 41 congressional districts into such units as may be constitutionally acceptable to the Supreme Court. The Legislature so acted because of an order of this court (June 17, 1969) directing that the Legislature "enact into law not later than January 30, 1970 a congressional districting plan that is in compliance with the requirements of the United States Constitution and which shall govern the election of members of the United States House of Representatives from the State of New York in the primary and general elections in the year 1970 * * *." We retained jurisdiction to conduct further proceedings as might be necessary to assure compliance with the order. There is no "requirement" in the Constitution for absolute equality in population in the various congressional districts. This requirement was created by judicial interpretation in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) wherein the Supreme Court said "'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." At pp. 7, 8, 84 S.Ct. at p. 530. Elaborations upon this construction of Art. I, § 2 have been set forth in the various subsequent decisions of the Supreme Court and, more particularly, in those addressed to the congressional districting of the State of New York.

Little time need be expended in an historical review of the apportionment situation. Because of population changes some ten years ago, New York was reduced from 43 to 41 congressional seats. In 1961 the Legislature prescribed the lines for 41 districts. In June 1966 the plaintiff brought this suit, attacking the districting plan because of wide disparities in the population of various districts. This court held the statute invalid for this reason. Wells v. Rockefeller, 273 F.Supp. 984 (1967), aff'd 389 U.S. 421, 88 S.Ct. 578, 19 L.Ed. 2d 651 (1967), and directed that a plan be promulgated which would be in conformity with Supreme Court decisions relating thereto.

In late February 1968 the Legislature enacted a second plan in which substantial district equality was obtained but on a somewhat sectional basis. This court, believing that the second plan conformed far more closely with the Supreme Court's specification of the salient factors to be taken into consideration and mindful that early 1968 was virtually on the threshold of a 1970 census, which would render any 1968 reapportionment quite academic, upheld the plan despite the realization that a slight shifting in lines in a few instances would have achieved better population equality in certain districts. 281 F.Supp. 821.

The Supreme Court noted probable jurisdiction, 393 U.S. 819, 89 S.Ct. 115, 21 L.Ed.2d 91, and on April 7, 1969, in a decision closely tied to its decision in Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1968) in-

volving reapportionment in the State of Missouri, invalidated New York's 1968 statute, holding in effect that Article I, § 2 of the Constitution required that congressional districts "provide equal representation for equal numbers of people". Pursuant to this mandate, this court directed the Legislature to enact a new plan not later than January 30, 1970 which would be in conformity with Supreme Court requirements, namely, "to equalize population in all the districts of the State." 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969).

On January 22, 1970 the Legislature enacted an Act to repeal Article Seven [the previous districting Act] and to substitute therefor a new Article Seven (S.6266, A.1518). Subsequently—but on the same day—an amendment was passed relating to Queens County lines. Both Act and amendment were signed by the Governor the next day and became Chapters 5 and ·6, respectively, of the Laws of·1970.

Fundamental to the Legislature's three plans, the Supreme Court's decisions thereon and this court's decisions is the hypothesis (unrealistic though it be) that the 1960 census figures are the basis for the apportionment. There are no other meaningful figures available for use in a statewide scheme. Not until the 1970 census is announced will the extent of the radical population shifts be officially known.[1] The present plan before the court adopts the 1960 census figures throughout the State as do we in our consideration thereof.

Although this case in theory is an adversary proceeding in that there is a plaintiff and there are defendants, for all practical purposes it merely involves the submission of the plan to this court for its opinion as to whether it conforms to the standards set by the Supreme Court.

To give plaintiff and any other persons properly qualified an opportunity to present their views and criticisms, this court directed that a hearing be held. At that time, plaintiff presented a plan (entitled his "basic" plan) which would better satisfy his views as to how the State should be divided. His proposed plan has a district population variance from a low of 406,923 to a high of 412,099 in contrast with the Legislature's virtually equal division of a low of 409,011 to a high of 409,814, the mean being 409,324 based on a 1960 population of 16,702,304.

As an alternative plaintiff tendered a "stopgap" plan in which many districts remain unaltered, several are slightly altered and a few substantially redrawn. He revises the Legislature's plan to eliminate according to his views what he calls "partisan gerrymandering". In fact plaintiff concedes that "In the present case the only issue that plaintiff brings back to this Court is his challenge to the 1970 congressional districting statute on the ground that the legislative action, if allowed to stand, would accomplish a partisan gerrymander, * * *." In short, because the Legislature has with remarkable mathematical accuracy complied with the Supreme Court's equality requirements (the only requirements specified in its decision), plaintiff no longer has available the population inequality arguments urged on previous occasions and would now impute to the Legislature wholly political motives in their creation of equal districts.

Whether were such a motive established it would have constitutional significance need not be discussed or decided unless and until there be proof that the district lines were actually drawn to accomplish an unconstitutional result.

To encase 409,324 persons within some kind of district boundaries must have required the skill of many draftsmen. They in turn must have reported their results to the Joint Legislative Committee on Reapportionment. Had plaintiff wished to ascertain what motivated the

---

1. There is speculation that New York may lose one or more congressional seats thus necessitating a substantial change before the 1972 election.

draftsmen to divide certain cities between districts or include or exclude certain towns and cities, certainly such proof should have been available from some source. No draftsman and no committeeman was called by plaintiff.

Plaintiff proceeded largely by taking the 1968 Republican and Democratic congressional election figures in certain districts, excluding therefrom Liberal and Conservative party votes and by assuming that these votes would be static and committed to the particular party in the future. Then by substituting his own suggested boundary lines, plaintiff claims that certain numbers of Republicans and Democrats could be added or subtracted from the districts as presently drawn which would be beneficial to his conception of the kind of political balance, or better imbalance, which he would like to achieve.

Specifically, plaintiff has singled out eight areas for his criticism:

the 6th C.D. (Queens);

the 4th and 5th C.D.s (Nassau);

the 15th and 16th C.D.s (Brooklyn);

the 17th and 19th C.D.s (Manhattan);

the 25th C.D. (Westchester-Rockland);

the City of Albany (split);

the City of Syracuse (split);

the City of Rochester (Marginal, i. e., not certain).

In each of these areas by making certain assumptions and by redrawing boundary lines, plaintiff believes that certain different political results can be achieved. This, however, is merely to bring about his own gerrymandering. As said by the New Jersey Supreme Court in Koziol v. Burkhardt, 51 N.J. 412, 416, 241 A.2d 451, 453 (1968) quoting from Jones v. Falcey, 48 N.J. 25, 222 A.2d 101, 105 (1966) (cases involving the charge of political gerrymandering):

" * * * it would seem impossible for a court to pass upon the validity of political interests without itself making a political judgment or appearing to do so. For these reasons the view generally taken in this new area of judicial activity is that, if the mathematics are acceptable, it rests with the voters, rather than the Court, to review the soundness of the partisan decisions which may inhere in the lines the Legislature drew."

The function of fixing district lines is, and should be, for the Legislature. Only when their handiwork is violative of fundamental constitutional rights should the courts interfere. This legislative prerogative is just as constitutional, if not more so, as equal representation, if proper respect for the division of powers between the executive, legislative and judiciary branches of government is to be maintained. By way of illustration, were we to accept plaintiff's proposal to reject the lines which split the cities of Albany and Syracuse thereby improving the chances of incumbent Congressmen of the Democratic party in forthcoming elections, we would indeed be entering the "political thicket"[2] and would be subject to charges of judicial political gerrymandering.

Furthermore, the foundation for many of plaintiff's arguments, namely, 1968 congressional election figures in certain areas for certain candidates, is unrealistic. Recent election figures (in particular 1968) in the areas selected for his challenge are only indicative of the voters' reaction to a particular candidate. True, throughout the State there are, and will be, areas predominantly Republican and predominantly Democratic. But this court will not be so naive as not to be aware of the existence, and in certain areas the increasing strength, of the Liberal and Conservative parties. And throughout the nation other parties

2. Colegrove v. Green, 328 U.S. 549, 556, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946).

have come into being which have recently received the support of many voters. Plaintiff's approach of a fixed Republican-Democrat society ignores the all-important factors, amongst others, of the candidate's personality, the public's conception of his ability and integrity and the current issues which he may espouse, or offer to espouse, on behalf of his constituents. For this and other reasons we find no legal (certainly no constitutional) basis for accepting plaintiff's speculations as to benefits, except to his own cause, to be derived from his own schematic approach.[3]

Although this decision could rest on plaintiff's failure of proof, a brief analysis of the legislative procedure is justified. The Legislature's plan could not have come into existence without the participation of many human beings. It was not placed before the Legislature by a *deus ex machina* descending from the heavens with a plan prepared on a Mount Olympus. Witness the Committee's expression of thanks "to the staff who were required to work long and tedious hours" and without whose effort "this most difficult project could not have been completed."

How was the plan prepared? According to the "Interim Report of the Joint Legislative Committee on Reapportionment" dated Albany, New York, January 19, 1970 and appendices thereto, there were twelve members of the Committee and seven in staff. This Committee was created by concurrent resolutions first adopted March 15, 1965 and subsequently May 2, 1969, to continue to March 31, 1970. Their report gives an account, and the only account made available to this court, of the rationale behind the fixing of the boundary lines adopted. Briefly stated, the Committee and the Legislature had to deal with certain constants, i. e., 41 districts, a mean population per district of 409,324, the topographical shape of New York State extending from

the tip of Fisher's Island and the Atlantic Ocean on the east to Lake Erie and Pennsylvania on the west. For practical reasons it was expedient for the districtographers to start at the east and move to the west in units of approximately 409,324. To achieve the goal of 409,-324 or as close thereto as possible, it was in their opinion necessary in certain instances to divide cities and counties. At the same time consideration was given to such municipal subdivisions as were in existence and to statements and opinions of various witnesses (19 listed in the Report) elicited at public hearings held in Brooklyn, New York City, Albany, Mineola and Buffalo on five occasions, respectively, between July 29, 1969 and August 19, 1969. The report was signed by eight of the twelve members of the Committee under date of January 19, 1970, Albany, New York. Four members did not sign.

Debate on the bills (Chaps. 5 and 6, Laws of 1970) occurred on January 22, 1970 in both Senate and Assembly. The arguments pro and con were directed largely to the areas covered by plaintiff here. The speakers urged acceptance or rejection based upon considerations affecting their own districts. The discussion often was acrimonious but left little doubt as to the speakers' beliefs concerning the merits or demerits of the plan. The bills were passed by a party vote of both houses.

No one of the four non-signing members of the Committee was called as a witness. Instead a paper entitled "Affidavit" of the four members—but signed only by two—was introduced to show that they had not been consulted during the preparation of the legislation. In addition a four-page statement entitled "Minority Report of Joint Legislative Committee on Reapportionment" dated February 16, 1970, was introduced although no substantiating proof to establish its competency was presented. How-

3. Dire predictions as to the previous redistricting plan insofar as increasing Republican strength apparently were not realized. Currently there are 26 Democratic Congressmen and 15 Republican.

ever, transcripts of the debates in both Senate and House were made available to the court. Pltf's Exhs. 3 and 4.

Reverting to the plan, obviously where one city or one county was too large or too small for a single unit some invasion into a neighboring district had to be made. The Supreme Court had indicated that former political unit lines were to be subordinated to equality and that modern transportational facilities now overcame former barriers.[4] Illustrative of this situation is the 25th C.D. where it was deemed necessary to fill out the district on the east side of the Hudson River to pick up segments of the population on the west side. The areas selected are connected in one case by the Tappan Zee Bridge and the other closely adjacent to the Bear Mountain Bridge.

■ To meet the goal of mathematical equality in a State in which population density varies widely, the Legislature had to cope with boundary lines drawn to accomplish this result. Some recognition was undoubtedly given to the pattern laid out in antecedent plans. However, geometric nicety of design must give way to numerical equality. A series of perfect squares, rectangles or even triangles, each containing 409,324 persons, could not be placed upon a map of New York State so that 41 districts would fit congruously therein. Therefore, curious shapes were bound to result. But it is not for this court to direct—even if we possessed the competence—the Legislature to straighten a line here, bend it there or include or exclude various towns in a manner differing from the plans as drawn.

Finally, in their briefs plaintiff and defendants both discuss the questions of jurisdiction and justiciability of the political gerrymander issue. We accept jurisdiction. Despite serious doubts as to the justiciability of the gerrymander issue, we find it unnecessary to resolve this question. Since there has been no proof presented of any gerrymander, other than plaintiff's speculations as to what might have motivated the individual Senators and Assemblymen in voting for the bills, any opinion expressed upon the hypothesis of gerrymander would be ill-founded and gratuitous.

■ In summary, no evidence has been presented to us to indicate that a good faith effort to comply with the Supreme Court's mandate has not been made. Of course, a myriad of plans could have been drafted. A few thousand people could have been moved here and there but, as previously stated, the sole question before us is: does the plan as enacted comply with the mandate of the Supreme Court? Our answer is that it does.

This three-judge court has now fulfilled its obligations to conduct proceedings and to examine the plan to assure compliance with the Supreme Court's mandate and this court's own order of June 17, 1969. Accordingly, it approves the plan enacted and as amended as in conformity with Constitutional requirements and dismisses the complaint.

CANNELLA, District Judge (concurring in part and dissenting in part).

I concur in the finding that on the basis of 1960 census figures the New York State Legislature has fully complied with "the command of Art. I, § 2 [of the U. S. Constitution], that States create congressional districts which provide equal representation for equal numbers of people," such command permitting "only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." Kirkpatrick v. Preisler, 394 U.S. 526, 531, 89 S.Ct. 1225, 1229, 22

---

4. Reynolds v. Sims, 377 U.S. 533, 580, 84 S.Ct. 1362, 1391, 12 L.Ed.2d 506 (1964):
   "Modern developments and improvements in transportation and communications make rather hollow, in the mid-1960's most claims that deviations from population-based representation can validly be based solely on geographical considerations."

L.Ed.2d 519 (1969); Wells v. Rockefeller [hereinafter "*Wells III*"], 394 U.S. 542, 546, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969). This achievement of the constitutional goal of "one man-one vote" with mathematical precision[1] clearly forestalls, if only for this year's congressional election, any valid legal challenge to the Legislature's plan on the basis of population equality.

The very fact, however, that there now exists nearly absolute numerical equality, coupled with this Court's retention of jurisdiction to assure conformance with our Order of June 17, 1969 that the Legislature enact "a congressional districting plan that is in compliance with the requirements of the United States Constitution," require that this Court deal with the merits of plaintiff's present challenge,[2] which he articulates as follows:

> The sole issue in this case is the permissibility or not under the Constitution of the United States of congressional districting lines drawn for partisan advantage.[3]

The plaintiff's thorny contention that the Legislature's action represents partisan gerrymandering is neither new in this case[4] nor in others. Much judicial effort has already been expended in this thicket attempting to deal with this issue. See, e. g., Sincock v. Gately, 262 F.Supp. 739 (D.Del.1967); Meeks v. Avery, 251 F.Supp. 245 (D.Kan.1966); Bush v. Martin, 251 F.Supp. 484 (S.D.Tex.1966); Sims v. Baggett, 247 F.Supp. 96 (M.D. Ala.1965).

In a concurring opinion in *Kirkpatrick*, Justice Fortas defined gerrymandering as "the deliberate and arbitrary distortion of district boundaries and populations for partisan or personal political purposes." 394 U.S. at 538, 89 S.Ct. at 1232. I understand the essence of this and most definitions of gerrymandering to be a partisan political *process* by which given electoral districts are determined. Such a process, *which is to be clearly distinguished from the district configurations or shapes resulting therefrom*, is an inevitable and inextricable tendency of party politics. And the fact that this process continues to materialize is hardly unlikely or unusual so long as members of political parties constitute state legislatures which have both specific constitutional authorization to administer congressional elections[5] and primary responsibility for apportionment of the districts. Cf. Reynolds v. Sims, 377 U.S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The logical way to prevent this recurring materialization would seem to be to change the present system. But what effect a change might have is debatable in view of the fact that all apportionment is "political" to the extent that "every line drawn wittingly or unwittingly will have a political effect different from another equally 'equal' and equally available line."[6]

To deal with the political ramifications of plaintiff's challenge to this partisan process would be to turn this Court precisely into what a state legislature *is*, but what the federal judiciary *should not*

---

1. The congressional districts within the State of New York are now all within ⅛th of one percent of the mean population for all the districts, 409,324. The largest district is the 34th C.D. with a population of 409,814 or 0.12% above the mean. The smallest district is the 41st C.D. with a population of 409,011 or 0.07% below the mean. See chs. 5 & 6, [1970] Sess. Laws N.Y. 8–29 *passim*.

2. Defendants argue that plaintiff lacks standing to bring this action. See Defendants' Memorandum in Support of the Constitutionality of Chapters 5 and 6 of the Laws of 1970, pp. 21–22. This

otherwise excellent brief overlooks, however, Swann v. Adams, 385 U.S. 440, 443, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967).

3. Plaintiff's Memorandum, p. 8.

4. Last Term, the Supreme Court did not reach nor express any view on the merits of this attack by the plaintiff. See Wells v. Rockefeller, 394 U.S. 542, 544, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969).

5. U.S.Const. art. I, § 4.

6. Dixon, The Warren Court Crusade For the Holy Grail of "One Man-One Vote," 1969 Sup.Ct.Rev. 219, 244–45.

*be,* namely, a political forum. See, e. g., the concurring opinion of Justice Clark and the dissenting opinion of Justice Frankfurter in Baker v. Carr, 369 U.S. 186, 259–260, 267, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962). This Court has already refused to become a political pawn in this case. See Wells v. Rockefeller, 281 F.Supp. 821, 825 (S.D.N.Y.1968). Nevertheless, a hearing was held on the present action on March 9, 1970.

I could readily concur with the majority's finding that plaintiff completely failed to prove his contentions regarding the partisan motives of the Legislature were it not implicit in such a finding that the overall issue raised by the plaintiff is justiciable. I must respectfully dissent since I find the partisan process that is gerrymandering to be purely a matter of politics. This case therefore now requires a reopening of the book on "political questions" which was shelved in Baker v. Carr. Mr. Justice Brennan's oft-cited summary regarding such questions reads as follows:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; *or a lack of judicially discoverable and manageable standards for resolving it;* or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
>
> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a po-

litical question's presence. The doctrine of which we treat is one of "political questions," not one of "political cases." 369 U.S. at 217, 82 S.Ct. at 710 (emphasis added).

Thus, to have found that plaintiff failed to sustain his burden of proof is really to have begged the preliminary question, namely, whether there is a judicially discoverable and manageable standard to begin with. I think not. Certainly, ordering members of the Legislature, for example, to participate as parties defendant and/or appear as witnesses in a judicial proceeding like the one herein seems to be hardly a manageable standard. Cf. Germano v. Kerner, 241 F. Supp. 715, 717 (N.D.Ill.), vacated per curiam sub nom. Scott v. Germano, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965). In fact, the present action makes it abundantly clear why since Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810), "it has repeatedly been pointed out that it is not the business of the federal courts to inquire into the personal motives of legislators,"[7] nor, for that matter, should inquiry be made into the motives of the plaintiff. The partisan process that is gerrymandering is a political question and nonjusticiable for lack of a proper standard.

The plaintiff argues, of course, that the issue he raises is justiciable. He refers the Court to Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), and Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). But the cornerstone of both of these decisions is the Fifteenth Amendment to the Constitution. In *Wright*, the Supreme Court affirmed the three-judge district court's disposition of a claim of racial gerrymandering on the basis of a failure of proof.[8] Although neither court addressed itself specifically to the issue of the justiciability of the claim, their dealing with the proof certainly implies that it is justiciable. A contrary inference is all but impermissible in view of

---

7. Harlan, J., dissenting, Baker v. Carr, 369 U.S. 186, 337, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

8. See 211 F.Supp. 460 (S.D.N.Y.1962).

the dictate of Amendment XV. Another three-judge court in this District, however, did address itself to the issue raised herein, to wit, partisan gerrymandering, and it ruled that such attacks "do not raise questions under the Federal Constitution * * *" WMCA, Inc. v. Lomenzo, 238 F.Supp. 916, 925 (S.D.N.Y.1965). The Supreme Court affirmed per curiam, 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed.2d 2 (1965), with Justice Harlan writing a concurring opinion wherein he interpreted the Court's affirmance as necessarily affirming the district court's ruling on gerrymandering. See 382 U.S. at 6, 86 S.Ct. 24. But the gerrymandering issue does not appear to have been the crux of the appeal. Nevertheless, a number of district courts faced with the same issue, albeit in a likewise inconsequential manner, have relied on *Lomenzo* in finding that gerrymandering is not justiciable. See, e. g., Sims v. Baggett, 247° F.Supp. at 104–105; Meeks v. Avery, 251 F.Supp. at 250–251; Bush v. Martin, 251 F.Supp. at 513; Sincock v. Gately, 262 F.Supp. at 828–833. In addition to relying on *Lomenzo*, the court in *Sincock* also interpreted the Supreme Court's per curiam dismissal of the appeal for "want of a substantial federal question" in Badgley v. Hare, 385 U.S. 114, 87 S.Ct. 338, 17 L.Ed.2d 207 (1966), as requiring the conclusion that gerrymandering is not cognizable under the Fourteenth Amendment. See 262 F.Supp. at 832–833. See also Dixon, The Warren Court Crusade For the Holy Grail of "One Man-One Vote," 1969 Sup.Ct.Rev. 219, 255–256. In none of these cases above, however, was the issue of gerrymandering sole and determinative. But I am not persuaded that the other courts would have decided otherwise with regard to that partisan process had they been in this Court's present position of mathematical equality. And in demanding this equality, the Supreme Court was not unmindful of the temptation to gerrymander. See Kirkpatrick v. Preisler, 394 U.S. at 534 n. 4, 89 S.Ct. 1225, 22 L.Ed.2d 519. See also Harlan, J., dissenting, *Wells III*, 394 U.S. at 552, 89 S.Ct. 1234, 22 L.Ed.2d 535.

At the hearing, the plaintiff indicated that he suspected that gerrymandering had taken place after he had scrutinized the configurations or shapes of the various new districts. He claimed to have found a number of districts with unusual configurations. Of course, he needed to look no further than his own 6th Congressional District [hereinafter "C.D."], the original new shape of which was grotesquely distorted overnight with an amending wave of the legislative wand. Compare Appendix C with Appendix D. Of necessity, the contortions of the Sixth became simultaneously those of the surrounding districts, to wit, the Third, the Seventh and the Eighth.[9] Aficionado of politics that the plaintiff obviously is, he apparently then wielded his own wand in conjuring up congressional districts for the entire State to suit his own tastes. That population statistics can be easily manipulated has never been doubted. What is very definitely in doubt, however, is whether plaintiff's proposed "Basic Plan" for the State as a whole represents an improvement over the Legislature's plan. In looking both at forms and figures, I find that it is not. The Legislature's overall plan is clearly superior.[10] Nevertheless, several of the specific proposals contained in plaintiff's alternative "Stopgap Plan" have merit.

In stating how he came to suspect that the Legislature had engaged in gerrymandering, the plaintiff hit on precisely what *is* justiciable in this post-equality redistricting controversy, namely, district configuration or the *result* of the partisan process. Just as "one man-one vote" represents a judicially discoverable and manageable standard, there

9. Compare ch. 5, [1970] Sess.Laws N.Y. 9–10, 11–12, with ch. 6, [1970] Sess.Laws N.Y. 25 *passim*.

10. Indeed, plaintiff's population figures are less equal than those of the Legislature. See generally Appendix A of Plaintiff's Memorandum.

is also such a standard with regard to configuration: *contiguity* and *compactness*. Article I, Section 4 of the Constitution specifically authorizes Congress to enact regulations regarding congressional elections or alter those of the state legislatures. Pursuant to this authority, Congress, as early as 1842, required that election districts for the House of Representatives be contiguous, 5 Stat. 491, and this requirement was restated in its districting Act of July 14, 1862, 12 Stat. 572. Similar enactments in 1901 [11] and 1911 [12] required that the districts not only be contiguous, but also compact and contain as nearly as practicable an equal number of inhabitants. The last requirement has, of course, already found specific application in the case at bar. Kirkpatrick v. Preisler, *Wells III*, supra; Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Contiguity and compactness have also been requirements in this case. The New York Joint Legislative Committee on Reapportionment stated on January 19, 1970: "The committee has made an earnest attempt to make districts compact and contiguous." [13] Indeed, this Court specifically instructed the Legislature in 1967 to "divide the State into 41 substantially equal parts, provided they be reasonably compact and contiguous." Wells v. Rockefeller, 273 F.Supp. 984, 991 (S.D. N.Y.), aff'd per curiam, 389 U.S. 421, 88 S.Ct. 578, 19 L.Ed.2d 651 (1967). Compact districts of contiguous territory are a legitimate desire on the part of the states. Reynolds v. Sims, 377 U.S. at 578, 84 S.Ct. 1362, 12 L.Ed.2d 506. While clearly laboring with the concept of "one man-one vote" in *Reynolds*, the Supreme Court's reference to the invalidity of

"crazy quilts, completely lacking in rationality" implies that wild district configurations are not constitutionally acceptable. 377 U.S. at 568, 84 S.Ct. 1362 at 1385. A three-judge court for the Middle District of North Carolina recently held:

* * * It is not necessary to a decision of this case to determine whether a motive to retain incumbent congressmen is a legitimate consideration in redistricting. We simply hold that it may not predominate over the requirements of practicable equality, and we think that *compactness and contiguity are aspects of practicable equality.*

The tortuous lines which delineate the boundaries of many of the congressional districts under the proposed plan, the resulting lack of compactness and contiguity * * * compels [*sic*] us to hold that the congressional apportionment is constitutionally invalid.[14]

A contiguous district has been defined as "one in which it is possible to travel between any two locations within it without leaving the district. The presence or absence of contiguity can be determined simply by glancing at a district map. There is no concept of 'best' contiguity." [15] Since the constitutional requirement of absolute population equality has been met in this case, compactness has become essentially a question of plane geometry. Starting with the axiom that the circle is the most compact plane figure within a given perimeter, and accepting the premise that the circle should therefore serve as the geometric figure of reference in determin-

---

11. 31 Stat. 733.

12. 37 Stat. 13.

13. Interim Report of the Joint Legislative Committee on Reapportionment, p. 13 (1970). That today's Congress is also not unmindful of these requirements is evidenced, for example, by Senator Edward M. Kennedy's introduction last year in the Senate of a bill listing contiguity and compactness as districting standards.

S. 10, 91st Cong., 1st Sess. (1969). See also Celler, Congressional Apportionment-Past, Present and Future, 17 Law & Contemp.Prob. 268 (1952).

14. Drum v. Seawell, 250 F.Supp. 922, 925 (M.D.N.C.1966) (emphasis added).

15. Weaver & Hess, A Procedure for Nonpartisan Districting: Development of Computer Techniques, 73 Yale L.J. 288, 290 n. 10 (1963).

ing compactness of districts,[16] the degree of compactness of a given district would be determined by the number of points in the district capable of connection by a straight line running entirely within the confines of that district.

Applying the standards of contiguity and compactness to the configurations of the congressional districts drawn by the Legislature, I find most to be generally in conformity therewith, given the initial requirement of population equality. Several districts clearly do not conform, however, even disregarding the obvious and unavoidable impediments to strict contiguity due to various bodies of water. The 7th, 11th, 16th, 21st, 25th, 27th, and 28th C.D.'s, for example, all are divided in one way or another by water.

At the hearing, the defendants, in summarizing, characterized plaintiff's case as "simplistic", and indeed with justification, as they clearly exposed plaintiff's political sophism. I doubt, however, that even a plaintiff approaching the political sagaciousness of the defendants would ever be able to carry the substantial burden of proof necessary to cut through the political thicket. This, of course, is the burden which the majority finds the plaintiff failed to meet. However, what I find in this case to be justiciable is district configuration, and the relatively simple standards of contiguity and compactness seem not to require any substantial burden at all on a proper party plaintiff. When a plaintiff can point to districts with grotesque shapes which appear on their face to be suspect, the burden shifts to the State to justify them just as it shifts to the State to justify variances in population. See, e. g., Kirkpatrick v. Preisler, supra.

Plaintiff's "Stopgap Plan" points to a number of newly adopted district configurations which readily remind one of Elbridge Gerry and for which the defendants gave no justification "free from any taint of arbitrariness or discrimination."

Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964).

Taking the objectionable districts in numerical sequence, the Fourth and 5th C.D.'s envisioned in Chapter 5 contain total populations of 409,369 and 409,343 respectively. The 5th District is clearly quite compact, but the Fourth is just as clearly not compact at all. See Appendix A. Plaintiff's proposed configurations for these two districts (Appendix B), on the other hand, represent a roughly equal and high degree of compactness. With such configurations, the 4th C.D. would have a population of 409,227 and the Fifth, 409,485. The defendants did not dispute these figures, nor any of the others contained in the "Stopgap Plan." The increased statistical variance, which is miniscule, seems to be more than justified by the much greater degree of compactness of the 4th District.

The Sixth and the 8th C.D.'s originally set forth in Chapter 5 were relatively compact and contained populations of 409,397 and 409,330 respectively. See Appendix C. The simultaneous amending of these C.D.'s, which also required minor adjustments to the Third and 7th Districts, resulted in grotesque and decidedly noncompact configurations for the Sixth and the Eighth with populations of 409,256 and 409,312 respectively. See Appendix D. That the Legislature itself felt that this arbitrary and unjustified amendment might be judicially suspect is evident from the inclusion in the *amending* Act of a savings clause (Section 2 of Chapter 6). I find the Sixth and 8th C.D.'s as set forth in this Act to be constitutionally invalid, and I would require that these two Districts (and the Third and Seventh) reassume the configurations originally contemplated (in Chapter 5).

The 16th C.D. is not strictly contiguous for the obvious reason that Staten Island does not yet have (by 1960 figures)

---

16. See, e. g., Roeck, Measuring Compactness as a Requirement of Legislative Apportionment, 5 Midwest J.Pol.Sci. 70 (1961).

enough people to comprise in itself a congressional district, but the island is directly connected to the rest of the Sixteenth by the Verrazano Narrows Bridge. What is not obvious with regard to this District, however, is why the snake-like demarcation of it from the adjoining 15th C.D. is necessary. I find that it is not and would adopt the straight line delimitation proposed by the plaintiff. See Appendix E. The populations of the two Districts under Chapter 5 are: 15–409,385; 16–409,381. The statistics for the proposed change read: 15–409,329; 16–409,437.

While the 17th C.D. (pop. 409,369) on Manhattan is relatively compact, the neighboring Nineteenth (pop. 409,348) is anything but. See Appendix F. Here again, these two Districts could easily be made all but equally compact simply by dividing them horizontally, beginning on the Hudson River at 33rd Street and proceeding east on 33rd Street to Third Avenue, north to 34th Street, and then east on 34th Street to the East River. See Appendix G.

The 25th C.D. adopted by the Legislature is neither contiguous nor compact. See Appendix H. It consists of three non-contiguous parts, with the Westchester segment connected to the Clarkstown-Orangetown segment by the Tappan Zee Bridge. Reaching the third segment, Stony Point, from the other two requires traversing part of the 27th C.D., or parts of both the Twenty-Sixth and 27th C.D.'s were one to cross the Hudson on the Bear Mountain Bridge from the Westchester segment. The new 21st C.D., by way of comparison, also consists essentially of three segments, one each in the Bronx, Manhattan and Queens, but there are ample bridge connections, and superimposing a circle on the Twenty-First shows a surprisingly high degree of compactness. Such is not the case with regard to the Twenty-Fifth. In view of the general compact-

ness of the 27th C.D. as drawn by the Legislature, I find plaintiff's stopgap proposal with regard to the 25th C.D. to be unacceptable since it would result in a significant distortion of the configuration of the 27th C.D., among others. An essentially horizontal line dividing so much of southern Rockland County as would be necessary to maintain the Twenty-Fifth's present population of 409,418 would serve the purpose of making both the Twenty-Fifth and 27th C.D.'s more compact, and with minimal effort involved. And the 25th C.D. would be contiguous, albeit trans-Hudson. I would require the Legislature to make such an effort to redraw the Rockland County line of demarcation for the two Districts by April 3, 1970; failure to do so by that time would result in this Court's drawing such a line. The defendants' explanation of why Rockland County was so split up was that the Town between Stony Point and Clarkstown, namely Haverstraw, was too large population-wise to be appended in its entirety to Clarkstown-Orangetown, whereas Stony Point could be. This may be true, but I remind the Legislature that observance of distinct political subdivisions is not an acceptable justification for variances in population,[17] and this rationale applies to requirements of contiguity and compactness.

I find the rest of the plaintiff's specific proposals in his "Stopgap Plan" not to be an improvement on the Legislature's districts. If anything, his other proposed districts are generally less compact than the ones adopted by the Legislature.

To summarize the relief I would grant in this case, I would order that the district configurations proposed by the plaintiff for the following C.D.'s be used for the 1970 congressional election: 4th and 5th (Appendix B); 6th and 8th (Appendix C); 15th and 16th (Straight line of demarcation shown in Appendix E); 17th and 19th (Appendix G). I

---

17. See Kirkpatrick v. Preisler, 394 U.S. 526, 533, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); Wells v. Rockefeller, 394 U.S. at 546, 89 S.Ct. 1234, 22 L.Ed.2d 535.

would order the Legislature to realign the 25th C.D. to conform with this opinion.

I find all the other districts drawn by the Legislature to be constitutionally acceptable.

STREET AND ROAD MAP OF NASSAU COUNTY LONG ISLAND MAP 3 NEW YORK

Appendix A

4th AND 5th C.D.s UNDER STATUTE OF JAN. 22, 1970

4TH C.D.

5TH C.D.

Appendix B

4th AND 5th C.D.s UNDER
PLAINTIFF'S "STOPGAP" PLAN

Appendix C

[A14293]

Appendix D

QUEENS DISTRICT
BOUNDARIES AFTER
AMENDMENT

64

[A1431]

Appendix F

Appendix G

### Appendix H

25th CONGRESSIONAL DISTRICT
(under Chapter 5)

Rough Sketch

