James P. **WENDLER** et al., **Plaintiffs,**

v.

The Honorable **Richard (Dick) STONE,**
Secretary of State of the State
of Florida, **Defendant.**

Joseph A. **PEREIRA,** Jr., **Plaintiff,**

v.

**Reuben O'D. ASKEW** et al., **Defendants.**

**Civ. A. Nos. 72–923, 72–928.**

United States District Court,
S. D. Florida,
Miami Division.

Aug. 18, 1972.

Robert S. Korschun, Miami, Fla., for plaintiff Pereira.

Edward L. Magill, of Stephens, Magill, Thornton & Sevier, and Dixon, Dixon, Lane & Mitchell, Miami, Fla., for plaintiffs Wendler, George, Holtman, Martin, Wisenfeld and Wolper.

Robert L. Shevin, Atty. Gen., and Jerry E. Oxner, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for defendants.

Before DYER, Circuit Judge, and ATKINS and ROETTGER, District Judges.

## ORDER GRANTING MOTIONS TO DISMISS

PER CURIAM.

These cases, both of which challenge the constitutionality, under the equal protection clause of the Fourteenth Amendment, of Florida's recently enacted congressional redistricting provision, Senate Bill 1291, Ch. 72–390, Florida Laws (1972), came before a three-judge court for hearing on pending motions to dismiss. Based upon a determination that the complaints fail to state justiciable causes of action, a majority of the court has decided that the motions to dismiss must be granted.

In Pereira v. Askew, et al., plaintiff, "an announced candidate for the Republican nomination" in the 15th United States Congressional District, contends that the dividing line between the 14th and 15th districts was the result of political gerrymandering designed to enhance the interest of one political party. He also alleges that the cities of Coral Gables and Miami Beach are cohesive subdivisions with their own cultural, economic, and political identities. The bisection of the cities in the redistricting allegedly deprived these entities of "their former and habitual political ties."

Plaintiffs in Wendler, et al. v. Stone, residents and registered voters in the cities of Miami, Miami Beach, and Coral Gables, complain of the boundary lines separating the 13th district from the 14th and the 14th from the 15th. These lines, they allege, divide several large cities, thus "diminishing the weight and influence of the votes of the residents of said cities." They argue that the redistricting constitutes an invidious discrimination against identifiable political, economic, and ethnic groups in the named cities. Allegedly the boundary lines were "gerrymandered" for the political purposes of securing re-election of incumbents or election of candidates of the same party. At the hearing on the motions to dismiss, plaintiffs disavowed any one man, one vote malapportionment challenge that might be read into paragraph 10 of their complaint. It is conceded that the redistricting created districts of virtually equal population.

The initial issue raised by these cases is the justiciability of the equal protection challenge to redistricting allegedly motivated by partisan political

considerations. Plaintiffs would lead the federal courts into a new "political thicket" of unmatched density, that of political gerrymandering. As discussed in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), "[t]he non-justiciability of a political question is primarily a function of the separation of powers." *Id.* at 210, 82 S.Ct. at 706. One critical criterion, applicable here, is that the court is asked to formulate a policy "for which judicially manageable standards are lacking." *Id.* at 226, 82 S.Ct. at 715.

It is highly impractical to ask a court to determine whether or not a given congressional district plan favors any particular political party. Voting statistics for past elections, relied upon by plaintiffs, can be grossly unreliable when used for prognostication. More disturbing is the request that the district court then redraw the boundaries to the equally political advantage of the complaining party. This might subject the court to "charges of judicial political gerrymandering." Wells v. Rockefeller, 311 F. Supp. 48, 51 (S.D.N.Y.), aff'd per curiam, 398 U.S. 901, 90 S.Ct. 1696, 26 L. Ed.2d 60 (1970). The task of drawing congressional district lines, within the confines of Baker v. Carr, *supra*, Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), and their progeny, is appropriately left for state legislatures.

■ One three-judge court, without referring to justiciability, has held that allegations of political gerrymandering do not state a claim under the United States Constitution upon which relief could be granted. WMCA, Inc. v. Lomenzo, 238 F.Supp. 916, 925–926 (S.D. N.Y. 1965), aff'd per curiam, 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed.2d 2 (1968). The late Mr. Justice Harlan, concurring, wrote the only opinion in the Supreme Court. He did so to reaffirm expressly that principle which the Court implicitly approved in its per curiam affirmance, i.e., that partisan gerrymandering may not be subject to constitutional attack under the Fourteenth Amendment. We agree with that determination.

Plaintiffs in Wendler v. Stone present, however, a second argument. The gravamen of their complaint is a challenge to the division of economic, political, ethnic, and social groups within the affected cities, such as the senior citizens on Miami Beach. It is argued that such alleged division reduces the influence of the vote of such interests, as a group, in the political process.

This claim is likewise nonjusticiable. It carries its own refutation. An endless list of groups with such a community of interest, covering an infinite number of geographic combinations, could be prepared. Those persons sharing an interest on one question would be unlikely to concur in their views on all questions. A court asked to accommodate those sometimes convergent, sometimes divergent, interests certainly cannot look to any judicially discoverable and manageable standards for guidance.

Counsel admitted to the Court that many redistricting plans, all satisfying the one man, one vote requirements, were possible. In such hypothetical plans, boundary lines could undoubtedly be drawn so as to encompass certain allegedly identifiable interest groups. Each plan would, however, exclude or divide certain other interest groups. The futility of the standard championed by the plaintiffs is readily apparent.

■ More importantly, however, in our view, the equalization of representation demanded is not constitutionally required. The decision of the Supreme Court in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), clearly establishes the principle that interest groups have no constitutional guarantee of representation in legislative halls. The court indicated that, in cases such as these, where the only alleged constitutional defect is an envisioned weakening of an interest group's political strength, rather than any alleged deprivation of an individu-

al's right to vote, no equal protection claim can be sustained. Indeed the court explicitly refused to approve the principle that "any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a single-member district." Whitcomb v. Chavis, 403 U.S. 124, 156, 91 S.Ct. 1858, 1875, 29 L.Ed.2d 363 (1971).

As we view *Whitcomb*, only where we are presented with allegations of a dilution of the voting strength of a recognizable minority because of race or country of origin does the broad panoply of protections of the Civil War Amendments, referred to by Mr. Justice White, operate to secure a very limited right to representation. *Cf.* Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964). The distinguishing feature in such cases, we conclude, is the specific concern of the Fifteenth Amendment for the voting rights of black citizens. As stated by Mr. Justice Douglas:

> It is said that if we prevent racial gerrymandering today, we must prevent gerrymandering of any special interest group tomorrow, whether it be social, economic, or ideological. I do not agree. Our Constitution has a special thrust when it comes to voting; the Fifteenth Amendment says the right of citizens to vote shall not be 'abridged' on account of 'race, color, or previous condition of servitude.'

Whitcomb v. Chavis, 403 U.S. 124, 180, 91 S.Ct. 1858, 1888, 29 L.Ed.2d 363 (1971) (concurring in part and dissenting in part). This special thrust does not compel the courts to intervene for the protection and perpetuation of recognizable partisan interests.

Accordingly it is ordered and adjudged that defendants' motions to dismiss are granted. The complaints in these causes are dismissed with prejudice for failure to state justiciable claims upon which relief can be granted.

ROETTGER, District Judge (dissenting).

The hearing before this three-judge court was held four days prior to the filing deadline for candidates seeking election to the United States House of Representatives. Although the defendants had filed a motion for summary judgment on the day of the hearing, argument before the Court was limited to the defendants' motion to dismiss.

The majority correctly rejects the allegations of plaintiff Pereira who asserts the Congressional districts were unconstitutionally drawn because the location of the district perimeters was motivated by partisan political considerations. However, in Wendler v. Stone plaintiffs asserted at the hearing that their complaint was not based on a charge of partisan political gerrymandering but, rather, that there was a constitutionally impermissible gerrymander based upon drawing boundary lines so that (1) it constitutes invidious discrimination against the residents of recognizable and identifiable political, economic, and ethnic groups; (2) it discriminates against the residents of the cities of Miami, Miami Beach, Hialeah and Coral Gables by dividing these political subdivisions unnecessarily; and (3) the districts are neither compact nor contiguous.

Stripped of its allegations of partisan political gerrymandering, Pereira's suit also charges in paragraph 10 that the cities of Coral Gables and Miami Beach were arbitrarily divided by the legislature in drawing the boundary lines between the Fourteenth and Fifteenth Congressional Districts.

I concur with the majority opinion there is no constitutional standard to support Wendler's first claim that residents of "[recognizable and] identifiable political, economic, and ethnic groups" have been invidiously discriminated against by the redistricting plan. Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). *But see*

Howard v. Adams County, 453 F.2d 455 at 457 (5th Cir. 1972).

In both cases plaintiffs claimed a constitutionally impermissible gerrymander based upon the unnecessary division of cities within Dade County, Florida. Only Wendler's complaint assails the division of the cities of Miami and Hialeah between the Thirteenth and Fourteenth Congressional Districts, but both complaints attack the division of the cities of Miami Beach and Coral Gables in arriving at the boundary lines between the Fourteenth and the Fifteenth Congressional Districts. The latter district is the southernmost in the state and basically comprises the Florida Keys and the southern portion of Dade County. Plaintiff Pereira alleges that 60 percent of the population (namely, 15,500 voters) of the city of Coral Gables, which lies south of Miami, was moved north of the boundary line between the two districts while 50 percent (21,000 registered voters) of the population of Miami Beach was severed from the remainder of the city and brought south and west into the Fifteenth Congressional District.

The south half of Miami Beach is contiguous with the rest of the Fifteenth Congressional District only by crossing Biscayne Bay and only by means of the inclusion of a narrow strip of land on the west bank of Biscayne Bay until the district widens into its larger geographical base on the South Florida mainland. Judicial notice [1] may be taken of the fact that Miami Beach basically occupies a narrow island and is separated from every other city by water with the exception of a one-half mile boundary line at its northern end, which it shares with the city of Surfside.

There is no claim of mathematical disparity among the voters of the districts. Relying on Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), defendants assert that mathematical precision in the distribution of population in the district obviates a charge of constitutionally impermissible gerrymandering. Among the many bases given by the State of Missouri in Kirkpatrick for not having achieved numerical parity among its Congressional districts was the desire to maintain the integrity of certain political subdivisions, namely, county lines. However, the Court in Kirkpatrick rejected the Congressional redistricting plan solely because it did not afford numerical parity to the districts. Defendants apparently feel that once mathematical precision has been achieved in allocating the population among the districts, the redistricting is immune from attack.

The Supreme Court has never gone that far. In Kirkpatrick it noted that the State of Missouri admitted that it could have transferred "entire political subdivisions of known population between contiguous districts" and that this "would have produced districts much closer to numerical equality." Id. at 531, 89 S.Ct. at 1229.

Early in this decade of cases on reapportionment and redistricting plans, the Supreme Court in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (legislative reapportionment), stated:

Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering. Id. at 578, 84 S.Ct. at 1390.

Recently, in an apportionment decision involving a county board of supervisors, the Supreme Court rejected a challenge to an apportionment plan which maintained the boundary line integrity of the five constituent towns and allocated members of the board to the towns despite a total deviation of 11.9 percent

1. There is a regrettable paucity of documentation in the record. Plaintiffs had exhibits with them at the hearing but none were introduced in view of the limited question considered and the court's announced ruling.

from numerical equality in the apportionment plan. Abate v. Mundt, 403 U. S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971).

Presumably, the Supreme Court views gerrymandering as a justiciable question since the holding in Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), was based solely upon an absence of proof. *See also* Wells v. Rockefeller, 311 F.Supp. 48 (S.D.N.Y.1970).[2] The motion to dismiss with prejudice should not be granted as to this claim in either case.

Moving to the third claim, Wendler's assertion in Count I that Article 1, § 2 of the Constitution requires Congressional districts to be compact and contiguous is without substance.

However, Wendler asserts in Count II that the equal protection clause of the Fourteenth Amendment requires Congressional districts to be compact and contiguous. The Supreme Court has affirmed a lower court which ordered a legislature to draw the district boundaries not only to be numerically equal, but compact and contiguous as well. Wells v. Rockefeller, 273 F.Supp. 984, 991 (S.D.N.Y.1967); aff'd per curiam, 389 U.S. 421, 88 S.Ct. 578, 19 L.Ed.2d 651 (1967). One three-judge court held a redistricting plan constitutionally invalid both on the basis of lack of compactness and contiguity and a failure to achieve numerical parity. Drum v. Seawell, 250 F.Supp. 922, 925 (M.D.N. C.1966). See also the dissenting opinion

in Wells v. Rockefeller, 311 F.Supp. 48, 56 (S.D.N.Y.1970), which held that a justiciable question was presented by the claim that the districts lacked compactness and contiguity. *Id.* at 55 and 56. Various legal scholars have asserted there should be a requirement of compact and contiguous districts.[3]

Plaintiff Wendler has asserted a substantial constitutional question on the issue of compactness and contiguity. Regardless of how difficult it may be for plaintiffs to muster sufficient proof to support the allegations of their complaint, defendants' motion to dismiss with prejudice should not be granted at this juncture.

The Supreme Court and the lower Federal Courts have shied from entering the political thicket and have rejected contentions of impermissible gerrymandering when there was a lack of a plainly discernible bench mark. For example, the Supreme Court has accepted numerical parity among the districts as a constitutional standard and the matter of parity is a mathematically easy one to determine. At the other extreme, the courts have rejected the claims of gerrymandering on a partisan, political basis or the claims of discriminating against economic, or social, or ethnic groups because it is virtually impossible to focus upon a discernible standard in these areas.

Discernible standards do exist in the claim that the districts are not compact

---

2. The majority opinion in Wells v. Rockefeller obviously holds that a charge of political gerrymandering presents a justiciable question. The dissenting opinion points this out and rejects the holding of the majority but goes on to find that a justiciable question is presented by the claim that the districts lack compactness and contiguity. 311 F.Supp. at 55 and 56, respectively.

3. Hon. Emmanuel Celler, Congressional Apportionment—Past, Present and Future, 17 Law & Contemp.Prob. 268 (1952); Weaver & Hess, A Procedure for Non-partisan Districting: Development of Computer Techniques, 73 Yale L.J.

288, 300 et seq. (1963); and McKay, The Reapportionment Decisions: Retrospect and Prospect, 51 A.B.A.J. 133 (1965), Edwards, The Gerrymander and "One Man, One Vote", 46 N.Y.U.L.R. 879 (1971). This requirement is embraced by many state constitutions as well. *See* Edwards, Index Digest of State Constitutions (2d ed. 1959). Additionally The Reapportionment Act of 1901, 31 Stat. 734 (1901), specifically required Congressional districts to be contiguous, compact and contain, as nearly as practicable, an equal number of inhabitants. These requirements were continued in The Act of 1911, 37 Stat. 13 (1911) but were dropped in subsequent enactments. The pres-

and contiguous [4] and in the claim that there was an unnecessary and arbitrary subdividing of political subdivisions, especially cities. In this case there is an intertwining of these claims.

Although the factor of time required a quick decision of this matter prior to the filing deadline for the 1972 Congressional election, this Congressional redistricting plan presumably will be with us for the next ten years. Consequently, I must respectfully dissent from the view of the majority in granting defendants' motion to dismiss without permitting plaintiffs to amend their pleadings further.

---

ent law is found at 46 Stat. 26 (1929), as amended 2 U.S.C. § 2a (1958); *see generally* Wood v. Broom, 287 U.S. 1, 7, 53 S.Ct. 1, 77 L.Ed. 131 (1932).

4. See various formulae for measuring compactness in the articles listed in n. 3 and in the dissenting opinion, Wells v. Rockefeller, 311 F.Supp. at 57.