Sherman H. SKOLNICK and George Eskelinen, Plaintiffs,

Leon M. Despres, Realigned Plaintiff,

v.

MAYOR AND CITY COUNCIL OF CHICAGO, and Board of Election Commissioners of Chicago, Defendants.

No. 66 C 2134.

United States District Court,
N. D. Illinois, E. D.

Nov. 14, 1970.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM, ORDER AND JUDGMENT

CAMPBELL, Senior District Judge.

This cause is before the court on a hearing on the constitutional merits of a redistricting ordinance for the City of Chicago adopted by the City Council of the City of Chicago, November 6, 1970, and submitted to this court by the defendant Mayor and City Council of the City of Chicago, pursuant to a prior order of this court and of the Court of Appeals for the Seventh Circuit. For a full understanding of the issues presented in this cause, a summary of the background of this litigation is required.

This case originally came before this court in 1966, on a complaint filed by plaintiffs Skolnick and Eskelinen and challenging the constitutionality of then existing ward lines of the City of Chicago. It was the contention of plaintiffs that these ward lines did not conform with the constitutional mandate expressed in terms of "one man-one vote," the standards for which were announced after the wards were last re-

districted in 1961. Because one of the defendant members of the City Council, Leon M. Despres, admitted in 1966 the allegations of the complaint and essentially embraced the position taken by the plaintiffs, he was realigned as a party plaintiff and has participated as such since that time. Furthermore, because the original plaintiffs were acting *pro se* and were not attorneys, I felt compelled to appoint counsel to represent the interests of the voters and citizens of the City of Chicago on whose behalf this case was properly brought. To provide that representation I appointed the Chicago Bar Association as *Amicus Curiae* and the Association in turn appointed three of its distinguished members, James P. Chapman, Robert L. Stern and Julian B. Wilkins, to participate in this case. I here express to each of them and to the Association my appreciation of their valuable assistance.

Upon my review of the evidence in the case, I found that the population deviations, ranging from 13 percent above the mean to 15 percent below the mean, were impermissible and concluded that the existing wards were not in conformity with the mathematical "one man-one vote" standards judicially formulated since the redistricting ordinance was adopted in 1961. I then invited all parties so desiring to file any plans or proposals they might have to remedy the malapportionment of the City's wards. Upon consideration of the suggestions submitted, I concluded that the appropriate remedy was to enjoin any further elections under the 1961 ordinance and to order the defendant City Council to prepare and adopt a constitutionally valid redistricting ordinance in time for the next election of members to that body scheduled for February 23, 1971. My order at that time (September 11, 1968) directed the defendant City Council to file a "fully detailed and lawfully enacted redistricting ordinance based on the 1970 census figures and conforming with the requirements of the United States Constitution" on or before November 1, 1970. The November 1, 1970 deadline was based on the evidence, particularly that presented by an expert witness provided by the Bureau of the Census, that census tract figures would be available on or before August 1, 1970.

Upon review, the United States Court of Appeals for the Seventh Circuit affirmed. However, that Court amended my order in that it required the City Council to file its ordinance on or before October 1, 1970, in lieu of the November 1 date contained in my original order. (415 F.2d 1291.) This modification was obviously based on the evidence that the tract figures would be available on or before August 1, 1970. The opinion of the Court of Appeals further thoughtfully provided that its modification was not intended to prohibit the District Court from granting reasonable extensions of the filing date if the facts as they developed so required. (415 F.2d at 1299.)

It is now well known that census tract figures were not available as expected on August 1, 1970. Indeed, these figures were not available until September 10, 1970 and even then a number of discrepancies required recalculation. The delay in obtaining census data information was in no way caused by any of the parties to this litigation. Nor can any blame be charged to the Bureau of the Census. The delays were national in scope and of uncontrollable causes. I did feel it my responsibility, however, to do all within my power to expedite the obtaining of the 1970 census tract figures, since the mandate of the Court of Appeals and my earlier order both decreed that these were to be used in preparing a constitutional redistricting plan for the 1971 and subsequent municipal elections. Accordingly, I kept in constant touch with the regional office of the Bureau of the Census within this district and with its Director and when it became clear that tract figures would not be available on time, I contacted the National Director of the Bureau of the Census and explained to him the vital interest of this court and of the people of the City of Chicago in obtaining

census tract figures as soon as possible. I felt it my judicial responsibility in this important case to enlist the good offices of the Director to extend special consideration and effort to expedite the compilation of the census tract figures for the City of Chicago. In response to this request, the Director and his Bureau did graciously and responsibly expedite the compilation of the Chicago data and I here express my thanks to them.

Because of the delay in obtaining the census tract figures, the defendants Mayor and City Council presented a motion for extension of time to file the redistricting ordinance. For the reasons above described, which I felt compelling, I granted the City's motion and extended the time to and including November 10, 1970. Plaintiff Despres opposed the City's motion for an extension and submitted a proposed reapportionment plan of his own under which he contended the aldermanic elections could be held. In his briefs in opposition to the defendants' motion for extension, plaintiff Despres stressed the fact that the first day for filing a petition of candidacy is November 16, 1970 and the last day for filing such a petition is December 21, 1970. Plaintiff Despres vehemently argued that any delay would cause "serious harm * * * to independent candidates for alderman in the February, 1971 election." The Court of Appeals affirmed my granting of the extension to November 10, 1970.

In my order granting the extension of time, I commended plaintiff Despres and his associates for their efforts in preparing a plan which they feel meets the Supreme Court's mandate of mathematical exactness in the preparation of representative wards. I also invited other interested parties to submit similar plans if they desired to do so. The ordinance presently before the court was duly enacted and timely filed by the defendant Mayor and City Council on November 10, 1970. Plaintiffs Skolnick and Eskelinen also filed a proposed plan just prior to that date (November 9, 1970). My order also set November 12, 1970 for a hearing on the constitutionality of the ordinance to be submitted again recognizing the important time limitations urged by plaintiff Despres in opposing the extension.

■ At the commencement of the hearing on the constitutionality of the City's ordinance on November 12, 1970, I advised all parties as to what I deemed the nature and purpose of the hearing. I again reiterated the principle which I have so often expressed in this case in the past and which has been expressed by the Supreme Court, that redistricting is constitutionally a legislative function and judicial relief becomes appropriate only after the legislative body charged with the responsibility fails to perform that duty according to federal constitutional requisites. Reynolds v. Sims, 377 U.S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506. I made clear that I have no authority under the Constitution to conduct another public hearing or a town hall meeting on the wisdom of the City Council's ordinance. The only issue before me is whether the plan as submitted is constitutional.

■ I therefore directed the parties to limit their inquiry to the issue: Does the ordinance before the court pursuant to the commands of the Court of Appeals and this court meet the most current standard of equal protection in terms of mathematical exactness and, if it can be demonstrated that it does not, do either of the alternative plans meet that exactness standard. See Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519; Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535.

As to this issue, I advised all parties, particularly the defendants herein, that I was fully aware of the constitutional theory, accepted by certain courts, that although mathematical exactness is required for congressional districting, a greater deviation is permissible in state and local redistricting. See e. g. Abate v. Mundt, 25 N.Y.2d 309, 305 N.Y.S.2d 465, 253 N.E.2d 189 (1969). I further

advised the parties that I disagreed with this theory and the conclusions of those courts which have adopted it and I adopted as the law of this case the exactness standard expressed in *Kirkpatrick* and *Wells*. See also Skolnick v. Illinois State Election Board, 307 F.Supp. 691 (N.D.Ill.1969).

■ I further advised the parties, that although mathematical equality was the only issue presented in the case thus far, on my own motion I was raising the issue as to whether the plan before the court would under any circumstances operate, "to minimize or cancel out the voting strength of a cognizable racial or political element of the voting population," Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110; Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401; Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376.

■ Significantly, there has been no serious challenge to the ordinance as presented for its failure to achieve mathematical exactness. Only plaintiffs Skolnick and Eskelinen attacked the ordinance on this basis; and their attack is aimed more at the use of enumeration districts rather than census tracts, charging that the enumeration districts may not prove as accurate as the census tract figures. While I understand and appreciate the point Mr. Skolnick and Mr. Eskelinen attempt to make, I believe the method used by the City Council, i. e., using census tracts and enumeration district figures, best complies with the Supreme Court's teaching to make a good faith effort to achieve mathematical certainty. In reaching this conclusion, I particularly note that of the census tract split where the split involved population, only *49* census tracts out of a total of 872 were split, requiring the use of the smaller enumeration districts. (See Appendix "A")

I have carefully analyzed the City's plan with the excellent assistance of Dr. Joseph Godwin, *Amicus Curiae,* who has served as my technical advisor and for whose assistance I am most thankful, and I have carefully checked its mathematical accuracy. I also compared it and the other plans submitted by the other parties with maps I received upon request from the Chicago Urban League, which maps detail areas of black residence within the City of Chicago as estimated and projected for the years 1970 and 1975.

I also consulted at length with the Regional Office of the United States Department of Commerce, Bureau of the Census, and have personally verified the consistency and accuracy of the census tract and enumeration district figures and boundaries contained in the City's proposed plan. I would like to express my appreciation and the appreciation of this court to Hon. Curtis T. Hill, Regional Director and to his most competent staff for their valuable assistance and cooperation.

My exhaustive personal survey has revealed only the following minor inaccuracies and obviously clerical errors:

1. The ward boundary between Wards 4 and 5 is intended to follow the tract boundary between Tracts 4104 and 4105, which is E. 52nd Street. There is a jog in the street, and a discrepancy in the city map. However, it appears that the ward boundary in the ordinance does follow the correct tract boundary and that the tract boundary plotted on the map is in error.

2. There is another boundary error on the map between Wards 1 and 11. All of Tract 6003 is in Ward 11; the map erroneously shows part in Ward 1.

3. In the supporting population data supplied by the City (Exhibit F) and particularly relating to Ward 24, census tract number 2922 containing a population of 7,911 was erroneously omitted from the supporting data. This tract is correctly contained on the map and in the ordinance itself, however, and the error seems merely a clerical one.

4. In numerous other instances, tract boundaries are not correctly placed on the City's map. (E. G. see tract boundary between Tracts 7605 and 1705, which is slightly east of the proper location.) These errors result only from overprinting and the written descriptions contained in the ordinance itself have been verified and do conform to tract and enumeration district boundaries.

None of these listed exceptions to the accuracy of the ordinance and supporting data submitted in any way affect its constitutional validity. Accordingly, I find and conclude from my own analysis of the facts, as well as from the factual and legal arguments presented by the parties, that the ordinance submitted fully complies with the stringent requirements of mathematical exactness promulgated in both *Kirkpatrick* and *Wells*. Based on the figures submitted by the United States Department of Commerce, Bureau of the Census, the total population of the City of Chicago is 3,329,090, and the ideal or "mean" ward would therefore contain 66,582 persons. Under the ordinance adopted and submitted, the ward with the smallest number of persons will contain 66,286 people and the ward with the largest population will contain 66,888. The ward with the lowest population therefore contains a deviation of only .44 of one percent from the mean and the ward with the largest population contains a deviation of only .46 of one percent from the mean. Moreover, the total deviation between the highest and the lowest populated ward is only .90 of one percent. So close to the exactness standard is the ordinance presented that 40 of the 50 wards deviate no more than .46 of one percent from the greatest to the least populous. As I stated above, I have personally verified this mathematical perfection with the Bureau of the Census, and its accuracy is assured because in drafting the ordinance the City Council followed census tract lines or enumeration district lines in lieu of other boundary descriptions.

The Bureau of the Census has also verified under my personal supervision and in my presence that the areas contained in each ward are contiguous. I should offer my own observation that each new ward obviously seems essentially to be built on the core of a former ward and in many cases retains the same number as its predecessor.

Apart from the question of mathematics, which since 1966 has been the only issue in the case, I raised on my own motion the question as to whether the plan proposed by the ordinance in any way operates to minimize or cancel out the voting strength of a cognizable racial or political element of the voting population. See Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110; Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401; and Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376.

■ Relative to this issue, plaintiff Despres sought to file instanter and without notice an amended complaint in which he essentially alleges that the ordinance before the court is the result of a conspiracy by members of the City Council which operates to minimize or cancel out the voting strength of various racial and ethnic minority groups and other political elements within the City of Chicago. Plaintiff Depres also requested an extensive continuance in order that he might develop proof of these charges which he candidly and properly admits are tantamount to an entire new lawsuit. Two other members of the City Council sought to join Mr. Despres as realigned plaintiffs.

Because the proposed complaint was as plaintiff Despres described, an entirely new lawsuit, coming at this late date and without notice, I denied him leave to file it and also refused to realign the other two aldermen to join in it. I did, however, permit Mr. Despres to offer his attempted amended complaint as a formal legal objection to the City's ordinance.

■ I also questioned the standing of Mr. Despres to assert the allegations in

his proposed complaint, on the basis that he was not harmed by the alleged infirmities in the City's plan. See Skolnick v. Board of Commissioners of Cook County, 435 F.2d 361 (7th Cir., 1970). Because of the importance of the issue, however, and because I had opened it on my own motion, I permitted Mr. Despres to submit any evidence or documentation he desired on the issue. I refused to grant the requested extension, however, as to do so would have required that I enjoin and unnecessarily substantially delay the entire municipal election process for the City of Chicago. To grant such relief solely on the basis of the speculative claims contained in Mr. Despres' self-described "new law suit" would certainly be an abuse of my discretion in adjudicating the limited constitutional issue before me.

Two other aldermen of the City of Chicago attempted somewhat similar delay and confusion. They sought leave to file as a part of this case a new "class action," challenging the City's redistricting ordinance. Their proposed complaint, coming on the final hearing on a decree, four and one-half years after this action was originally commenced and without notice to the court or to any other party, was likewise denied.

Their participation in this proceeding at this late date was also opposed by plaintiff Skolnick, who stated that he had requested the participation in this case by each of them repeatedly over the past four years, but was flatly refused.

I am convinced that the request of these four aldermen to intervene at this late date and start this lawsuit all over on the basis of their complaints alleging the same speculative generalities is an attempt to do serious mischief to the statutory elective processes of the City and State. Perhaps the more compelling motive for these "Johnny come latelies" as they are described by plaintiff Skolnick is only an attempt by them and certain organizations they purport to represent to get publicity for themselves.

Upon my review of everything before me relating to this case, I find no evidence that the City's redistricting ordinance is intended to operate or operates to minimize the voting strength of a cognizable racial or ethnic element of the population of the City of Chicago. I make this finding only after carefully comparing the City's map with the prior (1961) ordinance; with the maps and all other evidence, no matter how speculative, submitted by anyone; with all of the exhibits in this case and with the maps and supporting data which I obtained on my own from the Chicago Urban League, detailing areas of black residence in the City of Chicago as estimated and projected for the years 1970 and 1975. I think it significant that upon my comparison of the City's ordinance with the maps submitted by others, I find that at least as many Negro members would be elected to the Council under the City's plan as under the other plans submitted.

I should further note that as soon as the tract figures were available, I appointed Dr. Godwin my expert advisor and *Amicus Curiae*. I asked him to prepare purely objectively and with no racial, ethnic or political considerations, a map dividing the City into 50 wards of equal population. I have used this for my own comparison with the other maps submitted by the parties. Again, this map provides fewer wards in which Negro aldermen could be certain of election along purely racial lines than does the map offered by the City.

In this same vein, the independent material which I personally requested from the Chicago Urban League, showing the current location of concentrated Negro population in the City and their projection of what it will be in 1975, indicates that the City's map as drawn gives full Negro representation at present and that representation will increase with the projected movement of Negroes by 1975. That is to say if the Negro population moves as the Urban League's projection indicates, by 1975 additional wards now represented by Caucasian aldermen will in all probability be represented by Negroes.

Plaintiff Despres has also offered evidence which he contends supports the allegation that the City Council deliberately created numerous wards with Caucasian majorities, but with substantial Negro minorities. Plaintiff Despres further contends that the purpose of this scheme is to dilute Negro representation in the Council.

In support of this charge of unfairness to Negro voting strength, he relies upon the views of an expert named de Visé, whose proffered testimony is clearly speculative. Viewing this offer in the light of the objective opinion of the court's expert and advisor, Dr. Godwin, and considering the objections of the plaintiff Skolnick to the qualifications and objectivity of Mr. de Visé, I am convinced that to delay these proceedings to hear similar evidence on his and other proffered maps would be useless.

As to his "dilution" contentions, it could be argued with equal force that such a "scheme" would have the effect of increasing Negro influence in a greater number of wards and thereby indirectly increasing their voice and power in the City Council. In this respect, this case would become very similar to Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512, wherein the redistricting of certain congressional districts in New York was challenged on the basis that the plan there was designed to segregate on the basis of race. That case involved four districts on the Island of Manhattan and the claim was that one district was defined so as to include only Caucasians, leaving Negroes and Puerto Ricans to three other districts. It is not surprising in that case there were Negro parties on both sides of the issue. In rejecting the racial discrimination argument in that case, Mr. Justice Black, speaking for the Court, pointed out how viewpoints could differ on the question.

> "As the majority below pointed out, the concentration of colored and Puerto Rican voters in one area in the county made it difficult, even assuming it to be permissible, to fix districts so as to have anything like an equal division of these voters among the districts. Undoubtedly some of these voters, as shown by this lawsuit, would prefer a more even distribution of minority groups among the four congressional districts, but others, like the intervenors in this case, would argue strenuously that the kind of districts for which appellants contended would be undesirable and, because based on race or place of origin, would themselves be unconstitutional."

Implicit in plaintiff Despres' argument and in the other complaint sought to be filed is a plea for greater voting power via a consolidation of our City's population by race. This segregationist attitude has no place in our courts or in our country. As stated by Mr. Justice Douglas dissenting in Wright v. Rockefeller (at page 66, 84 S.Ct. at page 611):

> "Racial electoral registers, like religious ones, have no place in a society that honors the Lincoln tradition—'of the people, by the people, for the people.' Here the individual is important, not his race, his creed, or his color. The principle of equality is at war with the notion that District A must be represented by a Negro, as it is with the notion that District B must be represented by a Caucasian, District C by a Jew, District D by a Catholic, and so on. Cf. Gray v. Sanders, 372 U.S. 368, 379, 83 S.Ct. 801, 807, 9 L.Ed.2d 821. The racial electoral register system weights votes along one racial line more heavily than it does other votes. That system, by whatever name it is called, is a divisive force in a community, emphasizing differences between candidates and voters that are irrelevant in the constitutional sense. Of course, race, like religion, plays an important role in the choices which individual voters make from among various candidates. But government has no business designating electoral districts along racial or religious lines."

The only allegation of substantial fact by Mr. Despres seems to be that the ordinance results in a number of wards which have substantial black or Spanish-speaking minorities, but not complete control. In his own affidavit, Mr. Despres singles out the Eighteenth Ward as a principal example, stating that the "eastern extremity of that ward would be populated by black persons who would thereby be a minority in a ward in which the majority of the population was white."

These allegations, both the general and the specific, are contradicted by the evidence. Most of the wards referred to by Mr. Despres closely follow the core of a former ward. Indeed, the Eighteenth Ward specifically, like most wards which border on the City limits and therefore have certain fixed boundaries, closely follows the former boundaries and thus appears to have been only slightly reduced in the new ordinance to meet with mathematical requirements. Even the minor deviations which have necessarily occurred to reduce population have taken place in the eastern extremity, thereby completely refuting Mr. Despres' contentions. I should observe that any deviations in the Eighteenth Ward must occur in the eastern extremity, because certain of the other boundaries are fixed by City limits. I find, therefore, that these changes were not designed to promote either segregation or integration, but only to secure constitutional mathematical equality.

 I think it unnecessary to add that the practice, adopted in all redistricting, of following as much as possible the core of former districts, thus giving a certain continuity to government, is a valid legislative purpose.

It should also be borne in mind, as so well brought out by the testimony by Dr. Godwin on the trial of the case in chief some years ago, that the population of Chicago, all races and ethnic groups, is constantly moving—and that integration, racial and ethnic, is consistently on the increase. The census enumeration figures collected months ago are presently inaccurate, although we must accept them as the basis for a ward map prepared today. The same movement of population will gradually make today's ward map more and more inaccurate as we proceed into the ten-year period during which it will be in use.

Plaintiff Despres also contends, as does Mr. James P. Chapman, one of the attorneys serving as *Amicus Curiae*, that there may be evidence of what is generally referred to as "political gerrymandering," that is, of consciously drawing ward boundaries with a view toward the political consequences thereof. Plaintiff Skolnick joins in the cry of "politics," and also contends that the map proposed by co-plaintiff Despres is even "more gerrymandered and more discriminatory than the City's," and urges that only his plan is free from political taint.

In response to these allegations, counsel for the City argues that no ward boundary represents an intentional effort to include or exclude any person or persons within a particular ward and that the ordinance was prepared without concern for political consequences. While there is no evidence before the court of the motives of the Chairman or members of the subcommittee who drafted the proposed ordinance or the members of the Council who voted overwhelmingly to enact the ordinance, I believe it is safe to assume that the Council's subcommittee and its experienced Chairman, as well as the Council as a whole, were fully aware of the political consequences of the various ward boundaries as proposed and enacted. Indeed, I believe the subcommittee Chairman himself would take offense at his counsel's suggestion that he drafted this ordinance totally unaware of the political consequence of his action. But all districting is political. Every line on any districting map can have a political consequence different from another line. A reading of the *Kirkpatrick* and *Wells* cases makes it clear that the Court was aware of this fact. See dissenting opinion of Mr.

Justice White, 394 U.S. at 556, 89 S.Ct. 1234 and dissenting opinion of Mr. Justice Harlan, 394 U.S. at 552, 89 S.Ct. 1234. In adopting the exactness standard, the Court rejected the argument that some minor deviations caused by following natural boundaries would be justifiable because such deviations would minimize opportunities for partisan gerrymandering. 394 U.S. at 534, 89 S.Ct. 1225.

The politics inherent in every districting plan is reason enough why it is now and should always remain essentially a legislative function. As such, it will, of course, always be dominated somewhat by the party in power, subject to the check of the loyal opposition (in the City of Chicago ten dissenting aldermen can defeat the passage of a redistricting ordinance) and an intelligent electorate. Political considerations will always weigh heavily in any districting plan, whether it be drawn by the legislature, a bipartisan or so-called nonpartisan commission, or otherwise.

In arguing that certain political considerations may underlie the ordinance before the court, Mr. Chapman acknowledged that these allegations were speculative and deal with the difficult issues of the motives of the members of the City Council and would require complex proof on issues which, like the issues of race, are entering this lawsuit now for the first time. The proof presented is speculative at best and totally unconvincing. His candid presentation implied an acknowledgment that all of these issues may be better suited for another case at another time. While this suggestion offers the court a very inviting and easy way out from under this difficult issue, I would not be candid with the parties to this lawsuit or the electorate of Chicago if I avoided any comment on the justiciability of this issue. As the *Amicus Curiae* have pointed out, no court has ever held that the weighing of political factors in redistricting is unconstitutional, although there are certain references indicating otherwise. I submit that if it is un-constitutional to inject politics into districting, there is not a valid districting statute, ordinance or plan in effect in our country.

To date, at least four three-judge district courts have rejected the contention that political motivation may invalidate a reapportionment plan, and one of these decisions has been affirmed by the Supreme Court, per curiam. WMCA, Inc. v. Lomenzo, 238 F.Supp. 916, 925 (S.D. N.Y.1965), affirmed 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed.2d 2 (1965); Sims v. Baggett, 247 F.Supp. 96, 104–105 (M.D.Ala. 1965); Bush v. Martin, 251 F.Supp. 484, 513 (S.D.Tex.1966); Meeks v. Avery, 251 F.Supp. 245, 250–251 (D.Kan.1966); Sincock v. Gately, 262 F.Supp. 739, 828–833 (D.Del.1967). Mr. Justice Harlan, concurring in the *WMCA* case, understood that decision necessarily to reject the contention "that partisan 'gerrymandering' may be subject to federal constitutional attack under the Fourteenth Amendment." 382 U.S. at 6, 86 S.Ct. at 26. In Badgley v. Hare, 385 U.S. 114, 87 S.Ct. 338, 17 L.Ed.2d 207 (1966) (discussed in Sincock v. Gately at 262 F. Supp. 832–833) the Court dismissed, "for want of a substantial federal question" a Michigan case (Badgley v. Secretary of State, 377 Mich. 396, 140 N.W.2d 436) which was attacked as permitting gerrymandering. In the *Sincock* case, *supra*, after surveying the above authorities, the District Court concluded (262 F.Supp. at 833):

> " * * * Nonetheless it seems that the decision of the Supreme Court of the United States of November 21, 1966, in the Michigan reapportionment case, when considered in conjunction with its decision in WMCA, Inc. v. Lomenzo, requires the conclusion that political gerrymandering as defined in this opinion is not cognizable under the Fourteenth Amendment. We so hold."

■ Likewise, it should be borne in mind that the apportionment of the population into equal voting districts does not accomplish equal division of voters. Under the Constitution, voting

districts must be determined on the basis of population as established by the census. A skilled legislator with factual knowledge of the number of voters in a given area clearly can achieve political advantage by distribution of voters of his political persuasion into voting districts equal in population where it is obvious to him that they will become a majority. As long as this is done on an equal population basis and without deliberate racial discrimination, it is a proper exercise of the legislative function and it is constitutional.

In any event, I find and conclude that there is no substantial evidence of political gerrymandering in this case which would support any claim of invalidity under any case cited.

In conclusion, I find that the ordinance submitted by the defendants Mayor and City Council of the City of Chicago complies in every respect with the order of this court and of the Court of Appeals in that it is "a fully detailed and lawfully enacted redistricting ordinance based on the 1970 census figures and conforming with the requirements of the United States Constitution."

Let Judgment enter accordingly.

Finally, I would also like to observe that great credit for the foregoing achievement is due to the plaintiffs Skolnick and Eskelinen for their courage and fortitude in filing and effectively prosecuting this action over many years and in the face of great odds. Of over three million people who could have filed this suit and of the many civic organizations who should have filed it a long time ago, only these two citizens came forward to do so.

There are a few additional and ancillary matters that should now be decided. The Board of Election Commissioners of Chicago, a nominal defendant, points out that as a result of redistricting much uncertainty exists as to the application of certain statutory requirements relating to the election of members to the City Council. The Illinois statutes provide that nominations for alderman shall be by petition, and that all petitions for nomination of candidates, "shall be signed by such a number of legal voters as will aggregate not less than two percent of all the votes cast for alderman in such ward at the last preceding general election." (Ill.Rev.Stat. C. 24, par. 21–28). This section presents the question as to what boundary lines (old or new) are to be used to determine (a) how many signatures of legal voters are needed to support a valid nominating petition; and (b) who is eligible to sign such nominating petitions. Furthermore, the Board of Election Commissioners point out that under the Illinois election code, the above referred to nominating petitions may be filed with the Board of Election Commissioners commencing November 16, 1970, to and including December 21, 1970. (Ill.Rev. Stat. C. 46, par. 10–6). In my order of October 2, 1970, granting the requested extension of time for the filing of the redistricting ordinance, I directed the defendant Board of Election Commissioners to accept no such petition until further order of this court.

I am further advised by the Board of Election Commissioners and take judicial notice of the fact that on December 15, 1970, a special election will be held in Illinois, at which time a proposed new Constitution will be submitted to the voters. This raises the issue as to whether the new ward lines and new election precincts or the former ward lines and election precincts should be used in the conduct of that special election.

In the same vein as the problem suggested by the Board of Election Commissioners is the issue raised by the defendants Mayor and City Council in their petition for instructions advising me that by statute the City Council is required to redistrict the wards of the City of Chicago on or before the first day of December of the year following the year in which the national census is taken. (Ill.Rev.Stat. C. 24, par. 21–38). In other words, if this section of the statute is applicable, the City Council will be re-

quired to again undertake the momentous task of redistricting before December of next year (1971).

 The obvious resolution of these ancillary issues is as follows:

1. It is hereby ordered that the ordinance here decreed constitutionally valid shall take effect immediately and shall remain in effect, governing all municipal elections (Mayor and other City officials and members of the City Council), until the Council is required to again redistrict after the next (1980) census.

2. Though the ordinance is effective immediately, I hereby order that the special election relating to the proposed State Constitution and scheduled for December 15, 1970 may be conducted under the former ward plan and within the precincts as they existed at the general election just concluded on November 3, 1970. I believe it would be basically unfair to the people of Illinois and particularly those residing in the City of Chicago to require such an important special election to be conducted amidst the confusion that might otherwise prevail, should new ward and precinct boundaries be put into effect within such a short time.

3. As to the issues raised relating to the number of nominating petitions that must be filed and the residence requirements of signators, it is hereby further ordered that the number of nominating signatures required shall be two percent of the total number of "all the votes cast for alderman" in all wards at the last preceding election, divided by fifty. For example, if the total votes cast for alderman in all fifty wards at the last general election for alderman is 744,265, as appears of record herein, then all candidates for alderman in any ward must file nominating petitions containing at least 298 signatures (2% of 744,-265 ÷ 50). I further order that said petitions must be signed by lawful nominators residing within the ward the proposed nominee seeks to represent, that is, within the ward boundaries as they exist under the present ordinance hereinabove approved.

4. The previous order of October 2, 1970, enjoining the Board of Election Commissioners from accepting nominating petitions of aldermanic candidates is hereby vacated and said petitions may be filed and accepted commencing November 16, 1970, as provided by statute.

To the extent that the relief sought in the many complaints, petitions for instructions and motions filed herein is consistent with the foregoing orders, judgment and decree, the same is granted. To the extent any prayer or petition is to the contrary, the same is denied. This is a final and appealable order.

To the extent of my ability, I have endeavored herein to comply with the directions of our Seventh Circuit Court of Appeals, timewise and otherwise. I now respectfully request that distinguished Court to expedite in the public interest any appeal which may be taken from this Order and Judgment.

## APPENDIX A

The Court's own analysis of the Census Bureau data reveal that of the 872 tracts in the city, 49 tracts are split to obtain population by enumeration districts, 4 tracts are involved in a 3-way split, 45 tracts are involved in a 2-way split:

| TRACT NO. | IS SPLIT BETWEEN WARDS | TRACT NO. | IS SPLIT BETWEEN WARDS |
|---|---|---|---|
| 107 | 49, 50 | 4305 | 6, 7 |
| 207 | 40, 50 | 4313 | 7, 8 |
| 208 | 40, 50 | 4402 | 6, 21 |
| 301 | 48, 49 | 4403 | 6, 21 |
| 315 | 46, 48 | 4404 | 17, 21 |
| 603 | 46, 47 | 4804 | 8, 10 |
| 634 | 43, 44 | 5803 | 12, 22 |
| 1103 | 41, 45 | 5903 | 11, 12 |
| 1301 | 39, 40 | 5906 | 11, 12 |
| 1305 | 39, 40 | 6103 | 11, 12 |
| 1401 | 39, 40 | 6606 | 13, 15 |
| 1408 | 39, 40 | 6608 | 13, 15 |
| 1503 | 38, 45 | 6701 | 14, 16 |
| 1505 | 38, 45 | 6719 | 16, 17 |
| 1511 | 36, 38 | 6802 | 3, 16 |
| 1604 | 35, 39 | 6803 | 3, 14, 16 |
| 1908 | 30, 36 | 6809 | 16, 17, 20 |
| 2206 | 30, 33, 35 | 6902 | 3, 20 |
| 2211 | 30, 33 | 7107 | 17, 18 |
| 2426 | 26, 31 | 7108 | 17, 18 |
| 2516 | 28, 37 | 7109 | 17, 21 |
| 2519 | 29, 37 | 7110 | 18, 21 |
| 2521 | 29, 37 | 7304 | 21, 34 |
| 3702 | 3, 11 | 7505 | 19, 34 |
| 4210 | 5, 6, 20 | | |