**Vernon DUNN et al., Plaintiffs,**

**Oklahoma State Conference of Branches of the National Association For the Advancement of Colored People, Intervenor-Plaintiff,**

**v.**

**The STATE OF OKLAHOMA, its duly elected or appointed and acting officers and agencies, including David Hall, Governor, et al., Defendants.**

**Civ. No. 72–7.**

United States District Court,
W. D. Oklahoma.

June 15, 1972.

David L. Russell and Donald E. Herrold, of Jopling, Blankenship Herrold, Russell & Leonard, Oklahoma City, Okl., and William C. Doty, Jr., Oklahoma City, Okl., for plaintiffs.

Henry W. Floyd, Oklahoma City, Okl., and Nathaniel R. Jones and James I. Meyerson, New York City, for intervenor-plaintiff.

.Larry Derryberry, Atty. Gen., State of Okl., Robert H. Mitchell and Marvin C. Emerson, Asst. Attys. Gen., Oklahoma City, Okl., for defendants.

Before McWILLIAMS, Circuit Judge, BOHANON, Chief District Judge, and EUBANKS, District Judge.

## MEMORANDUM OPINION

PER CURIAM.

### GENERAL ISSUES AND JURISDICTION

This is an action for declaratory and injunctive relief brought by the Plaintiffs, individually, and on behalf of citizens and electors of the state similarly situated under 42 U.S.C. § 1983 and § 1988 seeking this Court to declare the State House of Representatives Apportionment Act of 1971, O.S.L.1971, c. 118, codified as 14 O.S.1971, §§ 111–115, both inclusive, (hereinafter called "Act") unconstitutional under the Federal and State Constitutions and to enjoin the Defendants from implementing the Act and requiring them to enact a new plan of apportionment using guidelines to be established by the Court upon hearing this cause.

The Intervenor, Oklahoma State Conference of Branches of the National Association for the Advancement of Colored People, has been conditionally per-

mitted to intervene in this cause by minute order of this Court entered March 21, 1972. Intervenor substantially relies upon Plaintiffs' allegations and seeks the same relief.

Jurisdiction of the Court was heretofore found present by Order of the three-judge Court entered February 17, 1972, and is invoked under 28 U.S.C. § 1343(3).

Plaintiffs and Intervenor contend that the Act is invalid under the equal protection clause of the Fourteenth Amendment, and violates the right to vote and be represented and freedom of political association of certain black citizens and electors of the State of Oklahoma under the Fourteenth, Fifteenth and First Amendments to the United States Constitution. Further, that it violates mandatory provisions of Article V, § 10A of the Oklahoma Constitution. That by virtue of its unconstitutionality this Court should declare the same void and enjoin the Defendant, State of Oklahoma, from implementing the Act and to enact another apportionment plan that meets state and federal constitutional guidelines.

The Defendants contend that the Act is a full and complete good faith compliance with the requirements of the equal protection clause of the Fourteenth Amendment, and does not violate the rights of black citizens of the State under the First, Fourteenth and Fifteenth Amendments to the United States Constitution, nor is it violative of pertinent provisions of the Oklahoma Constitution.

The trial of said cause was commenced on the 30th day of May, 1972, and numerous witnesses were heard and many exhibits received. The trial continued through May 31, 1972, and final arguments were heard on June 1, 1972. The parties were invited to submit proposed findings and conclusions which has been done, and the Court, being fully advised in the premises, does find and conclude as follows:

## FINDINGS OF FACT

1. This case is brought under (a) the First, Fourteenth and Fifteenth Amendments to the Constitution of the United States, (b) 28 U.S.C. §§ 2281 and 2284, (c) 28 U.S.C. § 1343(3), and (d) 42 U. S.C. §§ 1983 and 1988.

2. Plaintiffs are Vernon Dunn, Hannah D. Atkins, Kenneth Converse and Carl Robinson, all Democratic members of the Oklahoma House of Representatives, and Harry D. Smith and Maurice Ball, citizens of the State of Oklahoma.

3. The Intervening Plaintiff is the Okahoma State Conference of Branches of the National Association for the Advancement of Colored People (NAACP).

4. Defendants in the action are the State of Oklahoma, its duly elected or appointed and acting officers and agencies, including David Hall, Governor; Rex Privett, Speaker of the House of Representatives, Thirty-third Legislature; Finis W. Smith, President Pro Tempore of the Senate, Thirty-third Legislature; Edna Mae Phelps; William H. Mattoon, and Lee Slater, the duly appointed members of the State Election Board.

5. The House of Representatives Apportionment Act of 1971 (Ch. 118, 1971 Okla.Sess.Laws) has been codified as 14 O.S.1971, §§ 111 through 115. This Act was duly and regularly enacted in accordance with law. The Oklahoma Constitution required and population shifts since 1960 dictated the redistricting of the Oklahoma House seats in 1971.

6. The best available 1970 Bureau of Census data that were utilized in the State House of Representatives Apportionment Act of 1971 (House Bill 1065, Thirty-third Legislature, First Session; OSL 1971, C. 185; 14 O.S.1971, §§ 111–114) was the First Count Summary (computer) Tape of the Master Enumeration Districts List for Oklahoma, hereinafter referred to as "the First Count MED List". According to this data, the 1970 population of the State of Oklahoma was 2,559,253, which represents an

increase of 230,969 or 9.9 percent, from the 2,328,284 inhabitants of the State in 1960.

7. The formula and procedure for apportionment of the House of Representatives under the Act were derived by dividing 101 Representative Districts into the total population of Oklahoma according to the 1970 Federal Decennial Census. Under that division an "ideal" district would contain a population of 25,339 persons.

8. The smallest census areas for which the First Count Master Enumeration District List provided population figures were Enumeration Districts and Block Groups, of which there were a total of 4,013 such areas. The First Count Master Enumeration District List described each such area by county name, assigned census number and gave the 1970 population thereof.

9. The smallest area breakdown of population in non-metropolitan areas as provided by the United States Bureau of Census is the "Enumeration District". The smallest area breakdown of population in metropolitan areas in the First Count Master Enumeration List is Block Groups. Any further breakdown did not become available from the Bureau of Census until after the 1971 Legislature adjourned.

10. The 1971 Oklahoma Legislature used the First Count Master Enumeration District List exclusive of all other data as to population in drafting the House of Representatives Apportionment Act of 1971.

11. The 1971 Oklahoma Legislature utilized a computer in the preparation of the House of Representatives Apportionment Act of 1971. Except for insignificant errors cured by a 1972 statute, the 1970 population assigned in the Act is correct as reported in the First Count Master Enumeration District List.

12. The apportionment plan in the State House of Representatives Apportionment Act of 1971 closely approaches nearly exact mathematical equality of the 1970 populations of 101 State House of Representatives Districts. Mathematical variances are as follows:

(a) The least populous district (No. 48) is 302 below the ideal or 1.2 percent at variance with the ideal ratio population per district.

(b) The most populous district (No. 59) is 262 above the Act's ideal population or 1.0 percent at variance with the ideal ratio population per district.

(c) The range of variance is 2.2 percent from high to low.

(d) The mean-high variance is 25,434 or 0.3 percent at variance with the ideal ratio of population per district.

(e) The mean-low variance is 25,232 or 0.4 percent at variance with the ideal ratio of population per district.

(f). There are 56 districts whose population variance from the ideal is less than 100.

(g) There are 97 districts in which the deviation from the ideal is 229 persons or fewer. These 97 districts deviate from the ideal by less than one percent.

13. None of the Plaintiffs submitted (to the House of Representatives or its Committee on Constitutional Revision and Regulatory Services) a complete plan for districting the Oklahoma House of Representatives.

14. No other persons introduced (to the Oklahoma House of Representatives or. its Committee on Constitutional Revision and Regulatory Services) any plan for a complete redistricting of the House of Representatives. The evidence did establish that several amendments to the Oklahoma House of Representatives Apportionment Act of 1971 were submitted both in the form of amendments and Motions to Recommit to the Committee of the Whole instructions to amend. These were rejected.

15. Oklahoma City and Tulsa are the major urban and metropolitan areas of the State. They are generally situated in Oklahoma and Tulsa counties, respectively, although the greater metropolitan

areas of each extend into surrounding and contiguous counties.

16. Although Plaintiff Atkins requested computer information as to racial distribution of population, Speaker Privett refused upon the stated belief that such racial information should not be considered by the Legislature during the formulation of the House of Representatives Apportionment Act of 1971. The State House of Representatives and its Committee on Constitutional Revision and Regulatory Services did not use any census data pertaining to race or racial distribution of population in the consideration of the State House of Representatives Apportionment Act of 1971; nor were such census data printed or made available in usable form to any member of the Legislature or to any other person while the State House of Representatives Apportionment Act of 1971 was under consideration. Such information could have been made available from the tapes that were provided by the Census Bureau.

The uncontradicted testimony of Representative Nance, co-ordinator for the Bill in Oklahoma County, was that he invited the entire Oklahoma County delegation to a meeting at the Lincoln Plaza Inn where he invited each to submit a redistricting plan that would best suit their own desires. Two of the three black representatives from Oklahoma County attended this meeting, but the third, Representative Hill, was ill and unable to attend. Thereafter, black Representative Atkins did some work on a plan for the black populated area of Oklahoma County, but because of her preoccupation with other legislative duties and further because she feared that by giving away some of the black population in her District No. 98 so as to bring Districts 99 and 97 up to the required numerical strength and in turn taking into her district some white populated areas to compensate for the relinquished black areas, she might jeopardize her own chances for re-election, she abandoned her plan for redistricting. The Court further finds that to divide and dilute the black vote into three districts would jeopardize all three black district Representatives of Oklahoma County. Under the Act, two district Representatives are assured. The same principle would apply to Tulsa County.

17. The general area(s) of black populated concentration within Oklahoma and Tulsa Counties are a matter of common knowledge among the legislators of scuh areas of each county, respectively.

18. There was no evidence that any of the legislators involved in the formulation of the House of Representatives Apportionment Act of 1971 considered race as a factor in drawing district lines or that any legislator intended to discriminate against the black population of the State of Oklahoma through the creation of districts with such an intent. No witness for Plaintiffs, Intervenor, or Defendant testified to knowledge of any expression, communication, letter or memorandum indicating an intent on the part of any legislator to discriminate against any minority race during the time the House of Representatives Apportionment Act of 1971 was being considered. All Plaintiffs who testified admitted that they knew of no purposeful effort or attempt on the part of any legislator to dilute the vote of any minority race in any part of the State of Oklahoma.

19. The record is completely devoid of evidence that any citizen of the State of Oklahoma had less opportunity than any other citizen to participate in the political process, to vote for candidates of his choice, to register as an elector, to cast a ballot, to choose the political party he desired to support, to participate in its affairs, to be equally represented on those occasions when legislative candidates are chosen, or to be a candidate for office in the State of Oklahoma. Neither Plaintiffs nor Intervenors introduced any evidence tending to show that members of minority groups and races have been directly or indirectly inhibited, coerced, or prevented from stating any political belief whatsoever, attending any meeting, forming or joining any

political club, party or other association, or from exercising freely that freedom of speech and association which is guaranteed by the First Amendment of the Constitution of the United States.

20. In most instances districts as drawn in 1964 were used as a starting point for the formulation of new Representative districts. The Representative districts in the area of Tulsa having a concentrated black population are illustrative of this effort to preserve the core of previous Representative districts. Similarly, in the Oklahoma County areas of black population, the Act reflects a desire to follow boundaries of previous districts. Previous Districts 97, 98 and 99, all currently represented by blacks, had declined in population from 1960 to 1970 so that only two districts could be drawn in that area in the House of Representatives Apportionment Act of 1971. Districts 97 and 99 of the 1971 Act include approximately the same territory covered by previous Districts 97, 98 and 99. No inference of an intent to discriminate on a racial basis may be drawn from the face of the House of Representatives Apportionment Act of 1971.

We find the testimony of Intervenor's witness William Y. Rose, Director of the Oklahoma Human Rights Commission, to be true when he said that, assuming candidates of equal qualifications, a greater percent of white voters in Oklahoma will vote for a black candidate than will black voters support a white contender.

21. We further accept as true the testimony of Mr. Rose that approximately 45 to 50 percent of the eligible black population is registered to vote in Oklahoma, while approximately 55 to 60 percent of the eligible white population is registered to vote. We also accept as generally accurate Mr. Rose's testimony that a fewer percent of registered blacks tend to vote than registered whites in Oklahoma. Based on this testimony we believe that the plan of apportionment offered by Plaintiffs would not achieve its objective of creating three Oklahoma

County districts in which blacks could safely be expected to win. Under Mr. Rose's testimony, only District 98 in the plan offered by Plaintiffs, having 77 percent black population is a "safe" black district. District 97 is a marginal black district, having a black population of 64 percent, and District 99 has a black population of 44 percent, which under the testimony of Mr. Rose would probably be represented by a non-black. Plaintiffs' plan for apportionment of the State of Oklahoma was offered only for the purpose of showing that a better job could be done than was done. Plaintiffs' plan was admittedly drawn so as racially to gerrymander a maximum number of blacks into office. The 52,744 blacks in Oklahoma County cannot expect to elect more than two of their race to the Oklahoma Legislature under present housing patterns absent extreme and farcical racial gerrymandering.

Blacks were able to elect three of their race to the Oklahoma House of Representatives from Oklahoma County in recent years only because people had migrated away from District 99 to the extent that only 10,000 still resided therein in 1970, and they were mostly black. Because of this migration only 17,000 people resided in District 97 in 1970 and this district was predominately black. Blacks elected the third of their race in District 98 because the able, articulate and erudite Rep. Atkins attracted the votes of white citizens in substantial numbers.

22. House Bill 1065 was introduced in skeleton form, i. e., without district definitions, by its author, Rex Privett, the Speaker of the House of Representatives, on January 5, 1971. After the Bill was assigned to the House Committee on Constitutional Revision and Regulatory Services, a sub-committee of that Committee was selected by the Chairman of the parent Committee and was composed of five members. Although one black legislator served on the parent Committee, he was not appointed to the sub-committee.

23. No public hearings were held by the sub-committee or parent Committee considering House Bill 1065 of the First Session, Thirty-third Legislature. It was debated in the Committee of the Whole and on the House Floor.

24. In nearly all instances the crossing of county lines in the formation of House Districts was without any intent to discriminate against anyone, and was done to equalize population, but with regard to new districts 22, 51 and 60, the boundaries were intentionally drawn so as to impede the chances for re-election of white Representatives Converse, Dunn, and Robinson. This was done because they, and a few others, had opposed incumbent Speaker Privett and supported aspirant Ferrell in his unsuccessful bid for the speakership.

25. Convincing testimony from the Defendant's witness, Denise Stroud, an employee of the Oklahoma Legislative Council, was that the plan introduced by Plaintiffs had a variation from the most populous to the least populous district of more than 12 percent. In Plaintiff's plan there were 13 districts that were non-contiguous. The plan contained errors in 34 districts. Plaintiffs' plan crossed county lines in several instances and separated the town of Elk City, Oklahoma. This plan also contained a number of odd-shaped districts. Those errors and high population variances were unintentional and were the result of honest mistakes on the part of Representative Ferrell, the principal architect of Plaintiffs' plan.

26. The evidence established that every member of the House of Representatives had access to map and census information through the Legislative Council, and had the right and opportunity to prepare and submit plans and to participate in the passage of the Oklahoma State House of Representatives Apportionment Act of 1971.

27. The evidence established that there were no "open meeting" rules pertaining to the sub-committees of the Oklahoma House of Representatives during the formation of the Oklahoma State House of Representatives Apportionment Act of 1971. Plaintiffs who demanded entry into the sub-committee room got in, though Representative Dunn had to threaten force to gain admittance. The "closed" meetings of this sub-committee, though regretable, were justified because of the cramped space in the computer room and the time element involved in passing the Act in sixty legislative days and utilizing the computer during the limited hours it was rented. Utter confusion would have prevailed otherwise.

28. The proof established that the overriding consideration in the formulation of the Oklahoma House of Representatives Apportionment Act of 1971 was to attempt as nearly as practicable to create Representative districts of equal population in order to satisfy the "one man—one vote" rule established by the Constitution and interpreted by the Supreme Court of the United States, rather than to allow a de minimis variation or deviation.

29. The Oklahoma House of Representatives Apportionment Act of 1971 was a good faith effort of the Oklahoma Legislature to comply with the Fourteenth and Fifteenth Amendments to the Constitution of the United States while fulfilling its duty under Section 10A of Article V of the Oklahoma Constitution, as the latter has been construed by this Court, and the Act does satisfy those provisions.

30. As is noted in Finding No. 24, some of the districts created by this Act were politically gerrymandered as punishment for certain incumbents. Likewise, some districts were formed so as to favor other incumbents. In all instances those who were penalized are white Democrats and in nearly every case those favored are of the same party.

31. It will cost a candidate more money than before to campaign for election in those new districts where the incumbents were penalized for opposing

the House leadership, but these districts are in rural areas and because generally people have migrated from rural to urban areas, it was essential, in order to attain the "one man—one vote" rule, that almost every rural district be enlarged so added costs for electioneering will be encountered by nearly all rural candidates.

32. The increasing of the number of House Districts in the Act from 99, the number established by this Court in 1964 (See Reynolds v. State Election Board, 233 F.Supp. 323), to 101 was done in good faith and upon advice of the Oklahoma Attorney General that same was constitutionally permissible.

33. With regard to the districting in Tulsa County, we find that according to the 1970 census, 36,044 blacks resided there. Most of them lived in a fairly concentrated area. Under the district lines drawn by the Court in the 1964 *Reynolds* decision, the blacks have been able to elect only one of their race from Tulsa County. They will, in all likelihood, be able to elect only one under the new plan. The 1971 Legislature used those former boundary lines to a great extent in the formation of new Districts 72 and 73 and was color-blind in so doing. The deviations that were made were necessary to equalize population. The plan submitted by Plaintiff which would divide the black populated areas of Tulsa so as possibly to permit the election of two black representatives was admittedly racially gerrymandered and because of an inadvertent oversight the Plaintiffs' plan had non-contiguous areas in one of the proposed districts. We cannot fault the Legislature in its color-blind approach and we certainly cannot quarrel with the results of the Act when the Legislature substantially followed lines fixed by this Court in 1964.

## CONCLUSIONS OF LAW

■ 1. The Oklahoma House of Representatives Apportionment Act of 1971 (Chapter 118, 1971 Oklahoma Session Laws) which has been codified as 14 O.S.1971, §§ 111 through 115, does not violate the First, Fourteenth or Fifteenth Amendments to the Constitution of the United States.

2. The Oklahoma House of Representatives Apportionment Act of 1971 does not violate U.S.Code, Title 42, §§ 1983 and 1988.

■ 3. As a matter of law we conclude that the Oklahoma Legislature had the authority to increase the number of Representative Districts from 99 to 101 pursuant to the Court's ruling in Reynolds v. State Election Board, 233 F. Supp. 323 (W.D.Okla.1964).

Although the federally constitutional parts of the Oklahoma Constitution indicate that there should be 100 House members, the Court in the case last cited when it redistricted the Oklahoma Legislature in 1964, ended up by establishing only 99 House of Representatives districts and said that the Oklahoma Constitution provided for "approximately" 100 House seats. We conclude that the Legislature in 1971 had the right to rely upon that holding and we further conclude that 101 House seats is as near to being approximately 100 as the 99 seats established by this Court. No one has been denied equal protection because of this Act since the total population of the state was divided by the figure 101 to get the "ideal population" as nearly as possible in each new district that was created.

■ 4. The issue of incumbent or political gerrymandering, at least in single-member districting, such as in the apportioning of the Oklahoma House of Representatives, is non-justiciable, and by itself does not constitute invidious discrimination under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Wells v. Rockefeller, 398 U.S. 901, 90 S. Ct. 1696, 26 L.Ed.2d 60 (1970), affirming 311 F.Supp. 48 (S.D.N.Y.1970); W. M.C.A. Inc. v. Lomenzo, 238 F.Supp. 916, at 925 (S.D.N.Y.1965), aff'd 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed.2d 2 (1965); Sincock v. Gately, 262 F.Supp. 739 (D.

C.Del.1967); Kilgarlin v. Martin, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); Sims v. Baggett, 247 F.Supp. 96 (D.C.Ala.1965); and Cousins v. City Council of Chicago, 322 F.Supp. 428 (N.D.Ill.1971), at page 434; and Ferrell v. State of Oklahoma ex rel Hall, 339 F.Supp. 73 (W.D.Okla.1972); Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); Ely v. Klahr, 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971).

In Skolnick v. Mayor and City Council of Chicago, 319 F.Supp. 1219, it is stated:

> "But all districting is political. Every line on any districting map can have a political consequence different from another line. . . . The politics inherent in every districting plan is reason enough why it is now and should always remain essentially a legislative function. . . . I submit that if it is unconstitutional to inject politics into districting, there is not a valid districting statute, ordinance or plan in effect in our country."

In Klahr v. Williams, 313 F.Supp. 148, incumbancy gerrymandering was criticized, but the Supreme Court in Ely v. Klahr, 403 U.S. 108, 91 S.Ct. 1803 said, "The fact that district boundaries may have been drawn in a way that minimizes the number of contests between present incumbents does not in and of itself establish invidiousness."

5. The Oklahoma House of Representatives Apportionment Act of 1971 satisfies the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment to the Constitution of the United States as to the requirement that each State House of Representatives District be as nearly of equal population as is practicable. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); Sims v. Amos, 336 F.Supp. 924 (M.D.Ala.1972); Avery v. Midland

County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); Thigpen v. Myers, 211 F.Supp. 826 (D.Wash.1962); Sincock v. Duffy, 215 F.Supp. 169 (D.Del. 1963); Davis v. Synhorst, 217 F.Supp. 492 (D.Iowa 1963); Butterworth v. Dempsey, 229 F.Supp. 754 (D.Conn. 1964); Calkins v. Hare, 228 F.Supp. 824 (D.Mich.1964); Meeks v. Anderson, 229 F.Supp. 271 (D.Kan.1964); Drew v. Scranton, 229 F.Supp. 310 (D.Pa.1964); Bush v. Martin, 224 F.Supp. 499 (N.D. Tex.1963); Long v. Avery, 251 F.Supp. 541 (D.Kan.1965); Driggers v. Gallion, 308 F.Supp. 632 (M.D.Ala.1969); Klahr v. Williams, 303 F.Supp. 224 (D.Ariz. 1969); Wells v. Rockefeller, 311 F.Supp. 48 (S.D.N.Y.1970); Dinis v. Volpe, 264 F.Supp. 425 (D.Mass.1967); Grills v. Branigin, 255 F.Supp. 155 (D.C.Ind. 1966); Klahr v. Williams, 313 F.Supp. 148 (D.Ariz.1970); Sims v. Baggett, 247 F.Supp. 96 (M.D.Ala.1965); W.M. C.A. Inc. v. Lomenzo, 238 F.Supp. 916 (S.D.N.Y.1965); Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); and Ferrell v. State of Oklahoma ex rel Hall, 339 F.Supp. 73 (W.D.Okla.1972).

6. The House of Representatives Apportionment Act of 1971 does not violate the Fifteenth Amendment or the Fourteenth Amendment Equal Protection Clause, and does not invidiously discriminate against Negro citizens residing in Oklahoma or Tulsa Counties or in any other part of the State of Oklahoma. The 1971 House of Representatives Apportionment Act does not by design or consequential effect operate to dilute or cancel out the voting power of any racial minority. Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964); Mann v. Davis, 245 F.Supp. 241 (E.D.Va.1965); Wells v. Rockefeller, 311 F.Supp. 48 (S.D.N.Y. 1970); Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); Skolnik v. Mayor and City Council of Chicago, 319 F.Supp. 1219 (N.D.Ill.1970); Cousins v. City Council of Chicago, 322 F.Supp. 428 (D.C.Ill. 1971); Kilgarlin v. Martin, 252 F.Supp.

404 (D.C.Tex.1965); and Ferrell v. State of Oklahoma ex rel Hall, 339 F. Supp. 73 (W.D.Okla.1972).

7. Intervenor's argument, acquiesced in by Plaintiffs, that the history behind the Fourteenth and Fifteenth Amendments, together with the record of later maltreatment of the blacks, affirmatively requires that the Legislature meander and gerrymander to redistrict so as to give a maximum black representation and that no Court has yet decided this question, comes as some surprise to us. We thought we made it clear in Ferrell v. State of Oklahoma ex rel Hall, 339 F.Supp., at page 83 (recently affirmed by the United States Supreme Court with only Justice Douglas dissenting) that a color-conscience approach to districting, if designed to aid the blacks, is constitutionally permissible; if designed to harm the blacks, is impermissible, but a color-conscience approach is never mandated. We cited many other cases supportive of that view. We believe that the phrase "equal protection of the laws" means just what it says, not "more equal" or "less than equal" but simply *equal*. The color-blindness approach, used in the instant case, is preferable to the other alternatives.

One of the cases we cited in *Ferrell* was Mann v. Davis, 245 F.Supp. 241, wherein at page 245 the Court said:

"The concept of 'one person, one vote', we understand, neither connotes nor envisages representation according to color. Certainly it does not demand an alignment of districts to assure success at the polls of any race. No line may be drawn to prefer by race or color."

The case of United States v. Jefferson County Board of Education, 372 F.2d 836 (C.A. 5, 1966), cited by Plaintiffs and Intervenor in support of their argument in this connection is inapposite both legally and factually.

Another case we cited was Cousins v. City Council of Chicago, 322 F.Supp. 428 wherein at page 434 the Court said:

"Plaintiffs' claim that it is constitutionally essential that the proportion of the number of wards in which the majority is of a certain racial or ethnic identification must be the same as the proportion of the number of persons of such racial or ethnic identification is to the total population, is untenable."

We firmly believe that the Supreme Court said virtually the same thing in Whitcomb v. Chavis, 403 U.S. 124, 91 S. Ct. 1858, and a holding to the same general effect was reached in Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603. See also Skolnick v. Mayor and City Council of Chicago, 319 F.Supp. 1219, wherein it was said:

"Implicit in plaintiff Despres' argument and in the other complaint sought to be filed is a plea for greater voting power via a consolidation of our City's population by race. This segregationist attitude has no place in our courts or in our country."

Furthermore, in Kilgarlin v. Martin, 252 F.Supp. 404, reversed in part, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771, it was said:

"There is no right to have proportional representation by races, creeds or colors in the Legislature so long as there is an equal opportunity for all to register and vote in districts of substantial population equality."

8. The factors of compactness, area, political units, historical precedents, economic and political interests, contiguous territory and other factors are not required as mandatory considerations under the United States Constitution, but rather, permissible consideration in designing an apportionment plan, so long as they do not detract from or subvert population equality as the one overriding consideration. As a matter of law it is not invidious discrimination for the State Legislature to cross the boundaries of political subdivisions, when such action is necessary or desirable to achieve as nearly equal population

as is practicable among House districts. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). The Oklahoma Constitution contains no provision requiring House Districts to be compact or that economic and political interests, historical precedents or political units be considered in their formation. Compactness may have been envisioned in the unconstitutional parts thereof (See Reynolds v. State Election Board, supra), wherein it is provided that each county, no matter how small its population, would be given one Representative; that counties having a population justifying more than one Representative, based upon 1/100th of the population of the state, but less than two, would be given two Representatives, etc. We observe from exhibits before us that under the Oklahoma Constitution, Article 5, § 10A, mostly invalidated by the *Reynolds* court, under present population figures Oklahoma would have 125 Representatives, not 99 or 101, and that some counties would be grossly over-represented while others would be woefully under-represented.

 9. One attacking the constitutionality of an apportionment act has the burden of showing invidious discrimination. See Baker v. Carr, 369 U. S. 244, 82 S.Ct. 691, 7 L.Ed.2d 663. This is because members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have. The presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is hostile and oppressively discriminatory against particular persons and classes. The burden is on one attacking the legislative arrangement to negate every conceivable basis which might support it. Madden v. Kentucky, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590. The proof of Plaintiffs and Intervenors has failed to meet the aforesaid burden.

■ 10. We have heretofore concluded that incumbancy and partisan gerrymandering are non-justiciable issues. For the same reasons it follows that the matter of increased expenses for campaigning in enlarged and odd-shaped Districts is a legislative, not a judicial, concern.

11. The challenge to the Act on the grounds of exclusivity, i. e. that the sub-committee met in "closed sessions" is without merit, for by Stipulation No. 18 it is conceded that the Act was duly and regularly passed, although in that stipulation a disagreement is noted on an unrelated procedural question that was neither briefed nor argued and so is deemed abandoned.

For all of the foregoing reasons the relief sought herein by Plaintiffs and Intervenor is in all things denied.

Counsel for Defendants will prepare an appropriate judgment.

The Clerk of the Court is hereby directed to mail a copy hereof to counsel of record.